**Marion L. ROONEY, Executrix of the Last Will Of George B. Rooney, Plaintiff,**

**v.**

**WITCO CORPORATION, Defendant.**

**No. 88 Civ. 0504 (MGC).**

United States District Court, S.D. New York.

Sept. 29, 1989.

Vladeck, Waldman, Elias & Engelhard, P.C. by Joseph J. Garcia and Ruth E. Harlow, New York City, for plaintiff.

Seyfarth, Shaw, Fairweather & Geraldson by Kathleen M. McKenna and Jane B. Stewart, New York City, for defendant.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This diversity action was originally brought by now-decesaed George B. Rooney against his former employer, the Witco Corporation, alleging intentional infliction of emotional distress and retaliation in violation of New York Executive Law § 296. Rooney's widow and executrix of his estate, Marion L. Rooney, has continued the action on her husband's behalf. Discovery is complete, and Witco has moved for sum-

mary judgment. For the reasons discussed below, the motion is granted.

## BACKGROUND

The following facts either are undisputed[1], or, where disputed, are plaintiff's version[2].

Witco employed George Rooney from his date of hire on July 16, 1970, at age fifty, until his retirement on November 1, 1987. In November of 1986, Rooney underwent surgery for lung cancer, as a result of which he could not work. Rooney received short-term disability benefits from November 22, 1986 through February 16, 1987.

In July of 1987, Rooney again became disabled, as a result of a recurrence of cancer in his spinal area. Rooney's physicians considered the illness to be terminal. Beginning on July 23, 1987, Rooney again received short-term disability benefits from Witco.

In September of 1987, Witco informed Rooney that according to its calculations, Rooney's short-term disability benefits would expire in late October of 1987. On October 8, 1987, Mr. and Mrs. Rooney met with Janice Aloia, Witco's Director of Human Resources, and Thomas Bickett, Witco's President and Chief Executive Officer, to discuss Mr. Rooney's benefit options. These options were: (1) continuing short-term disability payments by applying credit for unused vacation time; (2) receiving long-term disability; or (3) retiring in addition to receiving long-term disability. Rooney was told that under the terms of Witco's pension plan, if he retired, he could elect a 100% joint and survivor annuity, but that if he died before retirement, Mrs. Rooney would be limited to a 50% joint and survivor annuity. Rooney was also told about the conversion of his group life insurance policy to an individual policy, the continuation of his health insurance, and the distribution of moneys in his thrift savings plan.

By the time of the October 8 meeting, Aloia and Bickett each believed that Rooney was suffering from a terminal illness. At the meeting they informed Rooney that he would receive from Witco a payment calculated in accordance with Witco's severance policy, based on one week's pay for each year of service. Rooney was not entitled to severance under Witco's written severance pay policy, and Witco had never provided severance pay to a retired employee. In Rooney's case, the "severance" payment totalled $20,992.92. Rooney agreed to receive $2,461.52 in 1987 and $18,461.40 in January of 1988, after Bickett suggested this timing for tax purposes.

Rooney subsequently went on long-term disability in late October, and retired from Witco effective November 1, 1987. From late October until his death, Rooney received long-term disability benefits from Witco, but these payments were reduced by Rooney's pension benefits, which he began receiving on November 1. Once Rooney began to receive long-term disability payments and became a retired employee, Witco stopped paying for Rooney's life insurance coverage, since he was no longer eligible for Witco's group life insurance rates. Only unretired employees at Witco who go on long-term disability while they are under the age of sixty are eligible for group life insurance rates.

By November of 1987, Rooney came to the good-faith belief that Witco had forced him to retire because of his age and that Witco's treatment of him, including the forced retirement and the denial of group life insurance, constituted age discrimination. On November 23, 1987, Rooney wrote to William Wishnick, Witco's Chairman, to request him "to pass the word officially that I did not 'retire' but was forced into the status of 'Long Term Disabled.'" Neither Wishnick nor anyone else at Witco responded in writing to Rooney's letter.

Rooney received the $2,461.52 initial payment as scheduled. As Witco had expect-

---

1. *See* Undisputed Facts in the Joint Pre-trial Order and statements of fact in defendant's 3(g) statement which are not contested by plaintiff.

2. *See* Plaintiff's Contentions of Fact in the Joint Pre-trial Order and plaintiff's 3(g) statement.

ed, he used the money to pay the premium on his life insurance policy. On December 22, 1987, Joseph J. Garcia, Esq., of Vladeck, Waldman, Elias & Engelhard, P.C. wrote to Bickett on Rooney's behalf. The letter stated in part:

As of October 1987, Rooney was 67 years old. Apparently because of Rooney's age, Witco required him to retire and begin drawing his pension benefits at the same time as he began drawing long-term disability benefits. This forced retirement deprived Rooney of life insurance coverage. These facts, among others, lead us to believe that Rooney has a meritorious claim of age discrimination.

After Bickett received Garcia's letter, about January 4, 1988, he instructed Witco's Human Resources Department not to make the $18,461.40 payment to Rooney, pending advice from Witco's legal department. At that time, Bickett believed Rooney intended to use that money for payment of his life insurance premiums.

Rooney telephoned Aloia on January 7, 1988. She told him that her department was not processing the remaining payment and that he would have to speak to Bickett. Rooney then telephoned Bickett, who told Rooney that he was withholding the payment because Rooney had hired a lawyer. Bickett also told Rooney that in order to return to active employment status, Rooney would have to provide a doctor's certificate.

Sometime in January of 1988, Witco contacted the Equitable Life Insurance company regarding Rooney's individual life insurance policy. On January 12, 1988, Alan M. Abrams, Esq., Witco's Vice President and General Counsel wrote to Garcia that:

In reference to our recent discussions regarding the special fund for payment of life insurance, any bills for the conversion premium from Equicor may be forwarded by Mr. Rooney to us for payment. The premium so paid will be credited against the fund the balance of which now totals $18,461.40 as of January 1, 1988.

On January 20, 1988, Garcia telephoned Abrams and insisted that all communications between the Rooneys and Witco be conducted through counsel. Abrams agreed in writing to comply with that request. On January 25, 1988, in response to an inquiry from Garcia's office, Abrams wrote to Garcia that the balance remaining in the "special fund" would be paid to Mrs. Rooney in the event of her husband's death.

Also on January 25, 1988, Witco was served with Rooney's complaint, alleging intentional infliction of emotional distress and retaliation in violation of New York Executive Law § 296. Both of these claims derive from Witco's conduct after Garcia wrote to Bickett on December 22. The complaint seeks damages in the amount of the $168,461.40—$18,461.40 for the "severance" payment, which Rooney had not received, and $150,000 in compensatory and punitive damages for Rooney's "emotional and physical injury."

Rooney's health deteriorated during the month of January. He died on February 3, 1988. On March 4, 1988, Witco delivered a check dated February 18, 1988, in the amount of $18,461.40, to Mrs. Rooney's attorney, who in turn conveyed it to her. The Estate of George Rooney received the full proceeds of a life insurance policy issued by The Equitable Life Insurance Company. The Estate also received Rooney's full Thrift Savings Plan distribution by a check dated March 11, 1988.

## DISCUSSION

*Summary Judgment Standard*

A court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56; *see also Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). The test for granting a summary judgment motion is similar to the standard for a directed verdict. If the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party, then there is a genuine factual dispute and

summary judgment should not be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The essential question on defendant's motion, therefore, is whether there is a genuine dispute about a material fact. In this respect, all ambiguities and inferences should be resolved in plaintiff's favor. *See Brady*, 863 F.2d at 210.

However, plaintiff also must " 'set forth specific facts showing that there is a genuine issue for trial.' " *Fleming v. New York University*, 865 F.2d 478, 483 (2d Cir.1989) (quoting Fed.R.Civ.P. 56(e)). Plaintiff has had full opportunity for discovery. If plaintiff, who bears the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element essential to one of the claims, summary judgment should be granted on that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no "genuine issue as to any material fact" because a failure of proof on an essential element of a claim "necessarily renders all other facts immaterial" as to that claim. *Id.* 477 U.S. at 323, 106 S.Ct. at 2552.

*The Claim of Intentional Infliction of Emotional Distress*

In *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978), the New York Court of Appeals adopted the rule set forth in Restatement (Second) of Torts § 46(1) that "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." 43 N.Y.2d at 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215. Whether conduct is sufficiently "extreme and outrageous" depends on whether it "so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985); *Doe v. Ameri-*

*can Broadcasting Co.*, —— A.D.2d ——, 543 N.Y.S.2d 455 (1st Dep't 1989); Restatement (Second) of Torts § 46(1) comment d; *see also Hughes v. Patrolmen's Benevolent Association*, 850 F.2d 876, 883 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988) (noting strictness of requirements for this tort under New York law).

As evidence of defendant's intentional infliction of emotional distress upon Rooney, plaintiff points to the telephone conversations on January 7 between Rooney and Aloia and between Rooney and Bickett; defendant's decision to withhold the $18,-461.40 payment; defendant's subsequent correspondence "attempting to transform the severance money into a 'special fund' " out of which defendant would pay Rooney's life insurance premiums directly; defendant's promise "only after inquiry by counsel" to pay Mrs. Rooney any balance from the " 'special fund' " remaining after Rooney's death; and defendant's "belated response, after counsel intervened, to Mrs. Rooney's requests for benefits information." [3] Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 28–29. Plaintiff argues that defendant's knowledge of Rooney's terminal illness throughout this time, and the "overarching conflict regarding the severance payment," provide the context in which defendant's actions become extreme and outrageous. *Id.* at 29.

The conduct of which plaintiff complains is insufficient as a matter of law to provide the basis for a claim of intentional infliction of emotional distress. First, Aloia's response to Rooney's telephone inquiry consisted of notice to Rooney that her department was withholding the January payment and that he should speak to Bickett about it. This simple recital of the facts was not outrageous or extreme, even if those facts upset Rooney.

Nor was Bickett's behavior during the course of Rooney's telephone call to him so

---

**3.** Plaintiff also points to the facts that defendant "forced" Rooney to retire in October of 1987 and that Wishnick did not respond to Rooney's letter in November of 1987. The complaint and the Joint Pre-trial Order limit the allegedly tortious conduct to actions taken after Garcia sent the December 22 letter. Thus, any earlier conduct is not at issue.

offensive to civilized society as to be actionable. Bickett merely advised Rooney of the immediate reason for suspending the payment, and that Rooney would need a doctor's approval to return to work. Nor does the result change if Bickett became angry, as defendant concedes may have happened. General "name-calling," threats, and other insults and indignities, without the presence of other aggravating circumstances, are "the inevitable product of our modern existence" for which the law does not provide a remedy. *Fox v. Boucher*, 794 F.2d 34, 38 (2d Cir.1986); Prosser and Keaton, *Torts* (5th ed. 1984) § 12, at 49–60.

Next, neither the decision to pay Equicor directly rather than give Rooney the payment, nor the circumstances surrounding the decision-making process, constitute actionable conduct. The initial decision to withhold the payment pending legal advice was not an egregious response to Rooney's own decision to seek counsel. Similarly, the five days between the January 7 conversation and the January 12 letter to Garcia informing him of defendant's decision was not an outrageous delay, especially since there is no evidence that defendant was aware of any serious decline in Rooney's health during this time.

Plaintiff's contention that Rooney was harmed because he never had the opportunity to know whether he would in fact receive the payment does not render defendant's conduct actionable. Rooney had the opportunity to know before he died that defendant was willing to put the money to its intended use—to pay for life insurance for him. If Garcia did not keep Rooney so informed, defendant cannot be held responsible for that, since on January 20, two weeks before Rooney's death, Garcia insisted that defendant not have any direct communications with Rooney. Furthermore, as indicated above, there is no evidence that defendant sought to take advantage of the course of Rooney's illness to create uncertainty.

Plaintiff concedes that defendant believed that Rooney intended to use the payment to pay for life insurance after his retirement. The decision to pay Equicor directly, and thus accomplish the result intended by Rooney, clearly does not constitute atrocious conduct outside the bounds of decency, regardless of whether the January 12 letter characterized the payment as "severance" or as a "special fund."

With respect to the January 25 letter from Abrams, concerning Garcia's inquiry about the distribution of any remaining funds in the event of Rooney's death prior to their exhaustion, surely the representation that any balance would be paid to Mrs. Rooney was not tortious conduct.

Finally, the timing of Mrs. Rooney's receipt of benefits information, including the payment of medical bills, does not support a claim of intentional infliction of emotional distress. Mrs. Rooney requested this information in late December or early January. She testified at her deposition that prior to the filing of the complaint, none of defendant's employees ever told her that outstanding bills would not be paid (M. Rooney Dep. at 92–93), and that as of January 7, she believed that the other information would be forthcoming (*id.* at 93–94). On January 20, Garcia requested that defendant have no direct contact with the Rooneys, to which defendant acceded, and the requested information was sent to Garcia on January 29. Plaintiff has not proffered any evidence that Mrs. Rooney required the "intervention of counsel" to obtain the information. Nor is a delay of three weeks such a "belated" response as to constitute "harassment" of Mr. Rooney.

Although plaintiff is correct that an actor's knowledge of another's susceptibility to emotional distress by reason of some physical or mental condition may render conduct outrageous, *see* Restatement of Torts (Second) § 46 comment f, Rooney's illness is insufficient to render defendant's conduct actionable in this case. Rooney's condition does not in itself create liability. *See, e.g., Hoheb v. Pathology Associates of Albany*, 146 A.D.2d 919, 536 N.Y.S.2d 894 (2d Dep't 1989) (awareness of plaintiff's heart condition did not make defendant's conduct in restricting plaintiff's employment egregious). In addition, Bickett's re-

sponse to Rooney's telephone call was not gratuitous, given Rooney's threatened lawsuit for age discrimination.

More important, Rooney's illness did not require that defendant sacrifice its own economic self-interest or risk liability in tort. Plaintiff has not profferred any evidence that defendant's conduct was designed to cause emotional distress. On the contrary, plaintiff's own version of the facts shows that defendant's actions were designed to protect itself and to assure that Mrs. Rooney would be able to collect in full the proceeds from Mr. Rooney's life insurance policy. If defendant's primary purpose was to advance its own business interests, and any conduct that harmed plaintiff was incidental, defendant has not committed the New York tort of intentional infliction of emotional distress. *See O'Rourke v. Pawling Savings Bank,* 80 A.D.2d 847, 444 N.Y.S.2d 471, 472 (2d Dep't 1981) (granting summary judgment where defendant bank allegedly had taken advantage of plaintiffs to force a usurious loan and to increase mortgage rate, since plaintiffs did not show that bank committed an outrageous act and that the desire to cause emotional distress "was more than incidental to proper business motives"); *see also Impastato v. Hellman Enterprises, Inc.,* 147 A.D.2d 788, 537 N.Y.S.2d 659, 661 (3d Dep't 1989) (employees of movie theater not liable for asking patrons to leave theater and summoning police for help, where alleged misconduct was incidental to proper business motives in operation of the theater); *O'Dell v. New York Property Insurance Underwriting Association,* 145 A.D.2d 791, 535 N.Y.S.2d 777 (3d Dep't 1988) (conduct in connection with insurance investigation not actionable).

In short, as the court reiterated in *Green v. Leibowitz,* 118 A.D.2d 756, 500 N.Y.S.2d 146 (2d Dep't 1986), in dismissing a claim of intentional infliction of emotional distress based on intentional misrepresentations concerning the status and filing of the plaintiff's disability claim, "The gravamen of a cause of action for the intentional infliction of emotional distress is that the conduct complained of *'is especially calculated to cause,* and does cause, mental

distress of a very serious kind.' " 118 A.D.2d 756, 500 N.Y.S.2d at 148 (citing Prosser and Keaton, *Torts,* (5th ed. 1984) § 12, at 60.) (emphasis supplied). Analyzing the facts in the light most favorable to plaintiff, I conclude that no reasonable trier of fact could find that defendant's conduct was especially calulated to cause harm to Rooney or was so "atrocious and intolerable" as to give rise to liability. Therefore, defendant is entitled to summary judgment on this claim.

*The Claim of Retaliation*

On January 7, 1988, when Rooney telephoned Bickett to inquire about the $18,-461.40 payment, Bickett informed Rooney "that because he had engaged outside counsel, we had turned the matter over to our legal people in Witco; and that upon their advice, we were withholding payment until we could determine what course of action both parties were going to do" (Bickett Dep. p. 40). On January 12, 1988, Witco sent a letter to Rooney's attorney, Joseph Garcia, informing him that:

In reference to our recent discussions regarding the special fund for payment of life insurance, any bills for the conversion premium from Equicor may be forwarded by Mr. Rooney to us for payment. The premium so paid will be credited against the fund the balance of which now totals $18,461.40 as of January 1, 1988.

Plaintiff argues that defendant engaged in actionable retaliatory conduct when it "suspend[ed] payments to Mr. Rooney and unilaterally alter[ed] the terms of the severance agreement because he retained a lawyer to investigate his claim of unlawful forced retirement." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 21.

Section 296 of New York Executive Law provides:

1. It shall be an unlawful discriminatory practice:

. . . . .

(e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any

person because he has opposed any practices forbidden under this article....

The language of subdivision 1(e) essentially is repeated in subdivision 3-a, which applies specifically to the unlawful practice of age discrimination. N.Y.Exec.L. § 296, Subd. 3-a(c) (McKinney 1982).

The parties agree that the analysis to be applied to this claim is the same as that applied to claims based on federal anti-discrimination laws such as Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. Thus, in order to defeat this motion, plaintiff must proffer some evidence of the following three elements: (1) Rooney's participation in a protected activity, of which defendant was aware; (2) an employment action disadvantaging Rooney; and (3) a causal connection between the protected activity and the disadvantageous action, "that is, a retaliatory motive playing a part in the adverse employment actions." *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980); *accord Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir.1988); *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). The requisite causal connection may be established indirectly, through showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of employees engaged in similar activity, or directly through evidence of defendant's retaliatory animus towards the plaintiff. *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.) (citations omitted), *cert. denied*, 965 U.S. 484, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *see also Taitt v. Chemical Bank*, 849 F.2d 775 (2d Cir.1988).

It is undisputed that a contemplated lawsuit for age discrimination constitutes protected activity. For purposes of this motion, defendant concedes that plaintiff satisfies the first essential element simply by showing that Rooney held a good faith belief that the underlying challenged actions of defendant violated the law, as distinguished from showing that the conduct actually violated the law. *See Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989); *Manoharan v. Columbia University College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). Defendant argues that plaintiff cannot make a prima facie showing with respect to the other essential elements.

Plaintiff asserts that defendant's deferral of its payment to Rooney, and its "unilateral alteration" of the terms of the "severance agreement," constitute adverse employment actions that harmed Rooney. With respect to proof of a causal connection, plaintiff points to defendant's admission that it suspended the payment as a result of Garcia's letter threatening a lawsuit. Although defendant concedes its reason for initially withholding the payment, defendant also contends that Rooney was not harmed by this action because five days after his conversation with Bickett he was informed that he would receive—and Mrs. Rooney in fact did receive—the benefit for which the payment was intended. Plaintiff responds that the uncertainty created by defendant's initial refusal to pay caused Rooney mental anguish, even if he did not experience any financial loss.

The most fundamental issue with respect to the initial "suspension" is whether it constituted an adverse "action" in the first place, regardless of harm. In the usual case, the alleged retaliatory action has clearly affected the terms, privileges, duration, or conditions of the plaintiff's employment. *See, e.g., Dominic v. Consolidated Edison Co.*, 822 F.2d 1249 (2d Cir.1987) (plaintiff received poor job performance ratings through retroactive alteration, was subjected to unreasonable working conditions, and was discharged); *Davis v. State University of New York*, 802 F.2d 638 (2d Cir.1986) (failure to promote; discharge); *Mays v. New York City Police Department*, 701 F.Supp. 80 (S.D.N.Y.1988) (unfair work reference; placement of false information in plaintiff's personnel file); *Oakley v. St. Joseph's Hospital*, 116 A.D.2d 911, 498 N.Y.S.2d 218 (3d Dep't 1986) (discharge); *Joslyn v. Santaella*, 112 A.D.2d 305, 491 N.Y.S.2d 751 (2d Dep't 1985) (failure to promote); *Belanoff v.*

*Grayson*, 98 A.D.2d 353, 471 N.Y.S.2d 91 (1st Dep't 1984) (suspension; discharge); *State Division of Human Rights v. Genesee Hospital*, 85 A.D.2d 899, 446 N.Y.S.2d 735 (4th Dep't 1981) (refusal to hire); *Avis–High Bennett Rent-a-Car, Inc. v. State Human Rights Appeal Board*, 40 A.D.2d 992, 338 N.Y.S.2d 694 (2d Dep't 1972) (refusal to rent car); *see also EEOC v. Cosmair, Inc.*, 821 F.2d 1085 (5th Cir.1987) (total suspension of severance pay).

■ Here, defendant did not refuse altogether to pay Rooney, but temporarily refused to provide him this benefit while it determined the course of action which would best protect both its own and the Rooneys' interests. Plaintiff's period of uncertainty lasted for only five days. Plaintiff's speculative assertion that "in view of Witco's earlier breach of the terms of the severance package, Mr. Rooney could receive little comfort from the [January 12 and 25] letters," Plaintiff's Memorandum at 23 n. 8, does not raise a material issue as to whether the original decision to suspend the payment can be defined as an adverse employment decision. In this respect, there is no evidence that defendant considered the decision to be a final one, or informed Rooney that it was final.

Even if the initial suspension could qualify as an adverse employment action, plaintiff's evidence of retaliatory intent is insufficient to establish a prima facie case of retaliation. Plaintiff's only evidence of retaliatory motive is Bickett's admission that he told Rooney on January 7 that he was withholding the payment pending advice from counsel as to the effects of Rooney's threatened lawsuit. It would unreasonably distort the meaning of the term "retaliatory motive" to conclude that plaintiff could make a prima facie showing of retaliation simply by pointing to defendant's decision to await the advice of counsel before making a payment integrally related to the asserted basis for a lawsuit. *See* Letter from Joseph Garcia to Thomas Bickett (Dec. 22, 1987) (Garcia Aff.Exh.C.) (contending that Rooney's "forced retirement deprived [him] of *life insurance coverage*," contributing to the conclusion that "Rooney has a meritorious claim of age discrimination.") (emphasis supplied). In addition, given defendant's letters of January 12 and 25, no reasonable trier of fact could find that defendant sought to punish Rooney when it deferred the payment.

■ With respect to defendant's decision to pay Equicor directly, which allegedly changed the terms of the "severance agreement," there is no evidence that Rooney was harmed or that defendant sought by this action to punish Rooney for his threatened lawsuit. Plaintiff's assertion that defendant did not condition the way in which Rooney could spend the money at the time it was offered to him is immaterial. As an initial matter, despite plaintiff's repeated characterization of the payment as "severance," it is undisputed that the payment did not constitute severance as that term usually was meant by defendant, i.e., to compensate employees whose jobs were eliminated altogether. Rooney was the recipient of a special benefit, referred to by defendant as "severance" and calculated in accordance with normal severance pay policy, which plaintiff concedes defendant believed would be used to pay Rooney's life insurance premiums. Even if plaintiff could establish a contractual entitlement to this money, there is no evidence in the record that Rooney intended to use it for any purpose other than life insurance, or that Rooney informed defendant that he desired to use the money for another purpose, even after defendant sent the January 12 letter. The decision to pay Equicor directly does not evidence either an adverse employment action or retaliatory animus on defendant's part as required for a prima facie showing of retaliation under § 296.

## CONCLUSION

Because plaintiff has failed to make a sufficient showing with respect to either of her claims, and because no reasonable finder of fact could find for plaintiff on plaintiff's own version of the material facts, defendant's motion for summary judgment is granted.

SO ORDERED.