Mary A. VERGARA, Plaintiff,

v.

Lloyd BENTSEN, Secretary of the Treasury, Defendant.

Nos. 91 Civ. 1247 (SWK), 91 Civ. 6480 (SWK).

United States District Court, S.D. New York.

Nov. 15, 1994.

**584**

William J. Kelleher, Jr., Rockville Centre, NY, for plaintiff.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City by Allan N. Taffet, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this action for employment discrimination based on sex, defendant Lloyd Bentsen, Secretary of the Treasury (the "Government") moves, pursuant to Rule 56 of the

Federal Rules of Civil Procedure, for partial summary judgment. On June 18, 1993, the case was referred to Magistrate Judge Leonard Bernikow for a Report and Recommendation. Subsequently, on March 17, 1994, the Magistrate Judge issued a Report and Recommendation (the "Report") granting in part and denying in part the Government's motion. Presently before the Court are the Government's objections to the Report.

## BACKGROUND [1]

### I. The 1972–1988 Discrimination Allegations

In 1969, the Government hired plaintiff Mary A. Vergara ("Vergara") as a tax auditor in the Examination Division of the Internal Revenue Service ("IRS"). In 1970, Vergara applied for the position of Special Agent in the Criminal Investigative Division of the IRS ("CID") and, in 1972, she became the first female Special Agent at CID.[2]

Vergara alleges that she received disparate and discriminatory treatment during the hiring process and throughout her career with the IRS. For example, when she first became a Special Agent, her supervisor refused to assign her to an early morning arrest detail in Manhattan's meat-packing district. After she complained and the supervisor relented, the other Special Agents on the arrest detail told her that she would be responsible for waiting in the lobby of the IRS building until they arrived with the prisoners so that she could hold open the elevator door.

In another incident, in 1978, Vergara alleges that a revenue agent touched her breast and told a crude joke in the presence of IRS personnel. Vergara immediately filed a written complaint with several supervisors, including the Branch Chief and the District Director. According to Vergara, however, no action was taken because the accused was a veteran agent at the IRS.

---

1. Unless otherwise noted, the following statement of relevant facts is derived from Defendant's Statement Pursuant to Local Civil Rule 3(g); Plaintiff's Counter–Statement Pursuant to Local Civil Rule 3(g); and Vergara's Equal Employment Opportunity Complaint, filed November 19, 1990, annexed to the Affidavit of William

J. Kelleher, sworn to on July 29, 1993 ("Kelleher Aff."), as Exh. "1."

2. Prior to 1972, women were not permitted to serve as Special Agents at CID.

In 1980, Vergara applied for a managerial position with CID. Vergara spoke with Richard Murray ("Murray"), her Group Manager, in order to determine whether she would receive a favorable evaluation for the position. Murray informed Vergara that, while she was entitled to view the performance rating she had received for her work as a Special Agent, she would not be permitted to see her rating for managerial potential. Vergara alleges, however, that a male applicant had been given a copy of his managerial rating during this same time period.

Vergara later learned that Murray had in fact prepared two performance evaluations. The two evaluations were identical in all respects except that one evaluation concluded that Vergara possessed "very good potential" while the other concluded that Vergara had "limited or no potential" for a managerial position. *See* Evaluations, annexed to the Kelleher Aff., as Exhs. "1–B," and "1–C." Vergara alleges that the Branch Chief of CID was aware of the two evaluations but refused to take any disciplinary action against Murray. Vergara complained to the District Director of CID but no action was taken against any of the officials involved in the submission of the two evaluations. Shortly after complaining, however, Vergara was promoted to the position of Group Manager.

## II. The 1988–1990 Discrimination Allegations

Vergara served as a Group Manager from 1980 until 1988. In September 1988, Chief Randy Vaughn ("Vaughn") informed Vergara that she was being detailed to act as his "Staff Assistant." Vergara was told that her assignment to the Staff Assistant position initially would last for ninety days, after which time the position would become permanent. When Vergara requested a job description for the Staff Assistant position, she was told that none existed and that she should draft one. According to Vergara, there was no position description available because the Staff Assistant job had not existed in any branch of CID prior to her appointment to the position. Vergara alleges further that her supervisors neither gained the required authorization of CID's Regional Commissioner nor processed the necessary paperwork before creating the new Staff Assistant position. In fact, Vergara's personnel records continued to classify her as a Group Manager.

As Staff Assistant, Vergara was stationed outside Vaughn's office in the secretaries' area and had her lunch hours coordinated with the secretaries to ensure telephone coverage. Vergara maintains that her principal duties as Staff Assistant included general secretarial work and proofreading Vaughn's graduate thesis for his master's degree. After Vergara complained about the nature of her work assignments, she was informed that she was being transferred to the Regional Office for a period of ninety days beginning October 1, 1989. Vergara alleges that her supervisors failed to process the necessary paperwork in connection with this transfer.

Vergara remained at the Regional Office for approximately six months despite assurances that the assignment would last only ninety days. At the same time, however, a male Special Agent who had also received a ninety day transfer to the Regional Office, returned to his original position and also received "premium pay."

On March 21, 1990, Vergara met with CID Chief Peter Farrell ("Farrell") to discuss her role at CID, request a transfer back to her position as Group Manager and learn the reasons she had been refused "premium pay" (the "March 1990 Transfer Request"). Farrell allegedly told Vergara that she would not be permitted to resume her assignment as Group Manager, ostensibly because he would not allow a woman to take a step downward from Staff Assistant to Group Manager. *See* Deposition of Mary A. Vergara, taken on April 21, 1993 ("Vergara Dep."), annexed to the Kelleher Aff. as Exh. "25," at 328. Farrell stated further that "he had a lot of clerical things" for Vergara to do and that she would be his "troubleshooter." *Id.* at 329. When Vergara protested that Farrell was being unfair, Farrell allegedly stated that he "didn't have to be fair" and that, as Vergara did not belong to the union, "all he had to do was make a decision." *Id.* at 328. On March 24, 1990, despite complaining to

the Acting Executive Assistant to the Assistant Regional Commissioner of CID, Vergara was sent back to her position as Staff Assistant in CID's Manhattan office (the "March 1990 Staff Assistant Reassignment").

## III. The EEO Complaints and Retaliation

On March 23, 1990, Vergara sought counseling at the Equal Employment Opportunity ("EEO") office and subsequently filed a complaint alleging that she had been subjected to sex discrimination in connection with her assignment to the Staff Assistant position. Vergara alleges that, after filing the complaint with the EEO, supervisory personnel of the IRS retaliated against her in various ways. Accordingly, on November 19, 1990, Vergara filed retaliation charges against the Government in connection with her pursuit of the EEO complaint. Specifically, Vergara charged that her supervisors retaliated against her by (1) subtracting time taken to pursue her EEO grievance from her annual vacation time rather than granting her administrative leave as required by IRS regulations (the "Annual Leave Retaliation Claim");[3] (2) including negative information in her "drop file"[4] without first discussing the contents with her (the "Drop File Retaliation Claim"); (3) giving her a negative evaluation in September 1990 (the "September 1990 Appraisal Retaliation Claim"); (4) failing to give her a written appraisal for her six-month assignment at the Regional Office; and (5) cutting her premium pay.

On March 4, 1991, Vergara filed a second EEO complaint, alleging that she had received a baseless reprimand that had been circulated to other IRS executives. Vergara alleged further that her supervisors failed to provide her with an annual "Performance Management and Recognition System Performance Plan" despite the fact that other employees received copies.[5] Moreover, Vergara claimed that when EEO investigators sought to obtain her drop file, Howie Mann ("Mann"), her supervisor, falsely claimed that it had been destroyed in the normal course of business. Subsequently, Mann submitted the drop file to the EEO notwithstanding his earlier assertion that it had been destroyed.

On January 23, 1991, the EEO notified Vergara that her discrimination claim was rejected in part on the ground that the action was not timely filed. *See* letter from Regional Complaints Center to Vergara of 1/23/91, annexed to the Complaint as Exh. "C." Vergara was informed further that the determination "constitute[d] a final agency decision."[6] *Id.*

## IV. The Present Action

On February 21, 1991, Vergara filed the instant complaint, alleging that the Government's actions denied her "equal terms, conditions and privileges of employment because of her sex in violation of federal law." Complaint at ¶¶ 15, 17. She alleged further that the Government's actions caused "serious and irreparable financial, mental and physical injuries" and destroyed her career at the IRS. *Id.* at 18. She sought (1) reinstatement to a managerial position; (2) reclassification of her present position to that of Mid-Level Management (GS–15), retroactive to September 1988; (3) back pay; (4) monetary damages; (5) freedom from further reprisals; (6) disciplinary action against offending officials; (7) removal of inappropriate notes from her drop file; (8) correction of her evaluations; (9) attorney's fees; (10) a permanent injunction restraining the Govern-

---

3. Vergara's vacation time subsequently was restored after intervention by the District Director.

4. A drop file is maintained for each employee by a supervisor "to accumulate records, data and notes pertaining to conduct, development and performance" for the purpose of preparing employee evaluations. *See* Handbook for Criminal Investigation Group Managers (the "Group Manager Handbook"), annexed to the Kelleher Aff. as Exh. "9," at ¶ 540(5). The Group Manager Handbook provides that IRS supervisors should first discuss all notes, observations and summar-

ies before placing them in the employee's drop file. *See id.*

5. A Performance Management and Recognition System Performance Plan is issued annually to each employee to review performance and ensure compliance with IRS employment standards.

6. In November 1992, Vergara retired from the IRS.

ment and all persons acting on its behalf from continuing to engage in discriminatory conduct; and (11) a declaratory judgment that the Government's actions are unconstitutional and violate her statutory and common law rights. *See* Complaint at ¶ V.

On May 20, 1993, the Government moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment. Specifically, the Government argued that the portion of Vergara's discrimination claims that arose more than thirty days prior to her initial counseling session at the EEO are time-barred under the applicable statute of limitations.[7] The Government argued further that certain of Vergara's retaliation claims are groundless because the conduct complained of does not amount to adverse employment action. Specifically, the Government argued that Vergara's (1) Annual Leave; (2) Drop File; and (3) September 1990 Appraisal Retaliation Claims are without merit and should be dismissed.

## V. Magistrate Judge Bernikow's Report and Recommendation

On March 17, 1994, Magistrate Judge Bernikow issued the Report, recommending that the Court (1) deny the Government's motion with respect to Vergara's discrimination claims; (2) deny the Government's motion with respect to Vergara's September 1990 Appraisal and Drop File Retaliation Claims; and (3) grant the Government's motion with respect to the Annual Leave Retaliation Claim. *See* Report at 25.

Specifically, with respect to Vergara's discrimination claim, Magistrate Judge Berni-

kow determined that, although Title VII complainants seeking relief in federal court "must file their EEO complaints within 30 days of the allegedly discriminatory event," an exception is made for employer actions that constitute a "continuing violation." *See id.* at 9–10. The Magistrate Judge held that "[a] plaintiff demonstrates a continuing violation sufficient to toll the limitations period by showing *either 'a series of related acts, one or more of which falls within the limitations period or that the defendant employs 'specific discriminatory policies or mechanisms.'* " *Id.* at 10 (citations omitted) (emphasis added). The Magistrate Judge noted that Vergara "disclaims reliance on a theory of 'formal or official policy of discrimination,'" choosing instead to demonstrate that the Government had committed a series of related acts, one or more of which fell within the statute of limitations period. *Id.* at 12–13.

Applying the law to the case at hand, Magistrate Judge Bernikow concluded that the Government's conduct, "beginning with [Vergara's] 1988 Staff Assistant assignment and continuing until she retired," *id.* at 10, constituted a continuing violation that effectively tolled the statute of limitations.[8] *Id.* at 21. Specifically, Magistrate Judge Bernikow determined that, as the March 1990 Transfer Request and the March 1990 Staff Assistant Reassignment occurred within thirty days prior to Vergara's initial meeting at the EEO, the Government's conduct, beginning with Vergara's reassignment to the Staff Assistant position in 1988, amounted to the same "series of acts."[9] *Id.* at 12–13. Accordingly, the Magistrate Judge concluded that the tolled conduct included the (1) reas-

---

7. As the initial meeting with an EEO counselor occurred on March 23, 1990, the Government contended that any conduct occurring prior to February 20, 1990 is time-barred.

8. The parties agree that any conduct occurring before Vergara's assignment to the Staff Assistant position in 1988 is barred by the statute of limitations.

9. In holding that the March 1990 Transfer Request and the March 1990 Staff Assistant Reassignment occurred within the statute of limitations period, Magistrate Judge Bernikow also rejected the Government's argument that these incidents are not actionable based on the factual

record. Specifically, the Government had argued that as Vergara was *permanently* assigned to the Staff Assistant position in 1988, she could not be reassigned to the Staff Assistant position in March 1990. With respect to the March 1990 Transfer Request, the Government argued that this claim was not actionable on the ground that Vergara had been aware of her permanent status as a Staff Assistant for eighteen months prior to initiating the EEO process. Magistrate Judge Bernikow rejected these arguments on the ground that Vergara had raised "a question of fact concerning the finality of defendant's decision to make her a Staff Assistant." Report at 16.

signment to the Staff Assistant position in 1988; (2) temporary removal from premium pay in 1990; (3) denial of her March 1990 Transfer Request; and (4) March 1990 Staff Assistant Reassignment. *See id.* at 13.

With respect to the three retaliation claims, Magistrate Judge Bernikow determined that, in order to meet her burden of proving retaliation, Vergara had to demonstrate that she was "disadvantaged" as a result of "engag[ing] in protected activity." *Id.* at 22. Applying this requirement, the Magistrate Judge concluded that the (1) Annual Leave Retaliation Claim should be dismissed, as Vergara's annual leave was later restored, thereby remedying any potential disadvantage, *see id.* at 23; (2) Drop File Retaliation Claim is adequately pled because Vergara had a right to review any entries in her drop file, and the retaliatory notes affected her subsequent evaluations, *see id.* at 24; and (3) September 1990 Appraisal Retaliation Claim is viable if Vergara can prove that the September 1990 Appraisal contained misstatements amounting to adverse employment action, *see id.* at 24–25.

## VI. The Government's Objections

On April 5, 1994, the Government filed objections to the Report, contending that Magistrate Judge Bernikow erred by failing to grant partial summary judgment dismissing Vergara's (1) discrimination claims arising more than thirty days prior to the institution of EEO process; (2) discrimination claims arising out of the March 1990 Transfer Request and the March 1990 Staff Assistant Reassignment; (3) Drop File Retaliation Claim; and (4) September 1990 Appraisal Retaliation Claim. Specifically, the Government argues that the Magistrate Judge (1) misconstrued the legal standard in the Second Circuit for tolling the statute of limitations under the "continuing violation" doctrine; (2) erred in finding timely Vergara's discrimination claim arising out of the March 1990 Transfer Request and the March 1990 Staff Assistant Reassignment; (3) should have recommended dismissal of the Drop

File Retaliation Claim on the ground that Vergara has demonstrated neither that she was entitled to review her drop notes nor that other employees enjoyed any greater access to their drop notes; and (4) should have recommended dismissal of the September 1990 Appraisal Retaliation Claim on the ground that the appraisal did not affect the terms and conditions of her employment in any material way.[10]

## DISCUSSION

### I. Standard of Law

Rule 72(b) of the Federal Rules of Civil Procedure governs determinations by magistrate judges with respect to dispositive motions. Specifically, Rule 72(b) provides that, where a magistrate judge issues a Report and Recommendation that is dispositive of a claim or defense, the court must review *de novo* those portions to which the parties object. *See* Fed.R.Civ.P. 72(b).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which

---

**10.** Vergara has filed neither objections to the March 17 Report nor papers in opposition to the Government's objections.

that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09; *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1223 (2d Cir.1994). But the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

To determine whether the moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett,* 477 U.S. at 330 & n. 2, 106 S.Ct. at 2556 n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)).

## II. The Discrimination Claims

### A. Continuing Violation

The Government argues that Magistrate Judge Bernikow misconstrued Second Circuit law with respect to the continuing violation doctrine. Specifically, the Government maintains that the Magistrate Judge erred in determining that a continuing violation exists whenever a plaintiff proves "a series of related acts, one or more of which falls within the limitations period *or* that the defendant employs specific discriminatory policies or mechanisms." *See* Report at 10 (emphasis added). Moreover, the Government contends that a proper application of the continuing violation doctrine to the case at hand should result in the dismissal of all claims arising out of conduct that occurred prior to February 20, 1990. The Court agrees.

Plaintiffs seeking relief under Title VII of the Civil Rights Act of 1964 who invoke the administrative process must file their EEO complaints within thirty days of the allegedly discriminatory event as a prerequisite to maintaining a subsequent suit in federal court. *See* 29 C.F.R. § 1613.214(a)(1)(i). This prerequisite may be excused, however, on equitable grounds. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). One such ground espoused by the Second Circuit is the "continuing violation" exception. *See, e.g., Lambert v. Genesee*

*Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1404 (2d Cir.1993).

Under the continuing violation exception, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.,* 10 F.3d at 53 (citing *Cook v. Pan Am. World Airways, Inc.,* 771 F.2d 635, 646 (2d Cir. 1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986)). The continuing violation exception only applies, however, to "cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists or discriminatory employment tests," *Lambert v. Genesee Hosp.,* 10 F.3d at 53 (internal citations omitted), or "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d at 53; *Carrasco v. New York City Off–Track Betting Corp.,* 858 F.Supp. 28, 32 (S.D.N.Y.1994); *see also Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d at 1404 (stating that "the continuous violation exception applies only where discrimination is accomplished through a specific policy or mechanism").

For example, in *Cornwell v. Robinson,* 23 F.3d at 697, a plaintiff commenced an action for employment discrimination based on sex against the New York State Division for Youth ("DFY"). The plaintiff alleged that (1) DFY refused to assign more than one female to each staff unit; (2) the first female employees hired by DFY were assigned to the late shift only; and (3) although there was no written policy, females were not permitted to work the "overnight shift," which ran from midnight to 8 A.M. *Id.* Based on

these facts, the Second Circuit agreed with the district court's determination that the DFY's "personnel policies discriminated on the basis of gender," and therefore the continuing violation exception tolled the statute of limitations. *Id.* at 704.

In the present case, in contrast, Vergara expressly states that her complaint does not turn on any theory that the Government maintained "a system or policy which discriminates." *See* Plaintiff's Memorandum of Law In Opposition to Defendant's Motion For Summary Judgment, at 13. Vergara's allegations depend instead on the theory that, where there is a series of related acts, one or more of which occurs within the statute of limitations period, the continuing violation doctrine applies to toll the statute of limitations. The Magistrate Judge agreed and determined that the continuing violation doctrine applies in the present circumstances. The Court disagrees.

Specifically, the Magistrate Judge relied upon several cases that either predate the Second Circuit's decisions in *Lambert v. Genesee Hosp.,* 10 F.3d at 53, and *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d at 1404, or fail to follow their holdings. For example, Magistrate Judge Bernikow cited *Flynn v. Goldman Sachs & Co.,* No. 91 Civ. 0035, 1993 WL 336957, at *7 n. 3 (S.D.N.Y. Sept. 2, 1993) for the proposition that "[t]rial courts within this circuit have thus denied summary judgment in the defendant's favor where the plaintiff adduced evidence of a continuous discriminatory policy directed at an individual employee." Report at 11. This decision, however, predates *Lambert v. Genesee Hosp.,* 10 F.3d at 53, and is contrary to the Second Circuit's requirement that plaintiffs prove a "discriminatory policy or mechanism" when seeking to toll the statute of limitations under the continuing violation doctrine. *Id.*

Similarly, the Magistrate Judge erroneously relied upon *Cosgrove v. Sears, Roebuck & Co.,* No. 81 Civ. 3482, 1990 WL 106797, at *6 (S.D.N.Y. July 26, 1990), for the proposition that the continuing violation doctrine "applies to a discriminatory policy targeting an individual employee rather than towards a particular group." Report at 11. Again, this is

no longer an accurate description of the continuing violation doctrine in the Second Circuit.

In contrast, the Court finds *Duck v. New York City Dep't of Transp.*, No. 93 Civ. 7388, 1994 WL 440666, at *5, 1994 U.S.Dist. LEXIS, at *15, (S.D.N.Y. Aug. 10, 1994), instructive to the case at hand. There, this Court rejected a plaintiff's attempt to toll the statute of limitations under the continuing violation exception. The plaintiff alleged that he was harassed, denied promotional opportunities, demoted, suspended and ultimately terminated in a series of related discriminatory acts over a period of several years. *Id.* at *4–5, 1994 U.S.Dist. LEXIS at *13. Relying upon the Second Circuit's requirement that a plaintiff demonstrate "specific official policies or mechanisms," the Court determined that the plaintiff had failed to demonstrate the "existence of a genuine issue of fact that his allegations ... were 'continuing violations.'" *Id.* at *5, 1994 U.S.Dist. LEXIS, at *15.

■ Based on the legal standard for proving a continuing violation in the Second Circuit, the Court finds that the thirty-day statute of limitations bars Vergara's discrimination claim except to the extent that she has alleged conduct occurring after February 20, 1990. Vergara expressly has disclaimed reliance upon a theory that the Government has engaged in a systematic "discriminatory policy or mechanism," which is precisely the standard for proving a continuing violation. In fact, there is no allegation that the IRS similarly discriminated against other women such that a "discriminatory policy or mechanism" can be inferred. Unlike in *Cornwell v. Robinson*, 23 F.3d at 704, plaintiff here concedes the absence of a discriminatory policy on the part of her employer. Moreover, in reaching this decision, the Court is mindful that Second Circuit courts "consistently have looked unfavorably on continuing violation arguments." *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y.1989). Accordingly, the Government's motion for summary judgment with respect to Vergara's claims based on conduct occurring prior to February 20, 1990 is granted.

**B. March 1990 Transfer Request and Staff Assistant Reassignment**

■ The Government next argues that Magistrate Judge Bernikow erred in finding timely Vergara's discrimination claim based on the March 1990 Transfer Request and the March 1990 Staff Assistant Reassignment. Specifically, the Government contends that, as Vergara was *permanently* assigned to the Staff Assistant position in 1988, she could not be reassigned to the Staff Assistant position in March 1990. With respect to the March 1990 Transfer Request, the Government argues that this claim is not actionable on the ground that Vergara had been aware of her permanent status as a Staff Assistant for eighteen months before initiating the EEO process. The Court finds this argument unpersuasive.

The record is unclear with respect to the date in which the Staff Assistant position became a permanent assignment. On the one hand, there are indications that Vergara was informed that the Staff Assistant position would be her permanent new assignment as early as 1988. Specifically, Vergara testified that Vaughn "said after ninety days [the Staff Assistant position] would be permanent." Vergara Dep. at 345–46. On the other hand, Vergara was informed that the Staff Assistant position was only a two-year rotation. *See id.* at 172. Accordingly, it is unclear whether the position was intended to be permanent or to be filled on a rotating basis.

Moreover, Vergara has presented evidence that the Government failed to follow its own regulations in creating the Staff Assistant position. Specifically, some evidence suggests that the Government both failed to acquire the requisite approval of the Regional Supervisor and neglected to file the necessary paperwork for the creation of the position. In fact, Vergara was forced to perform Staff Assistant duties for approximately one year before a position description setting forth her responsibilities was created. The Court finds that these factors create an issue of fact regarding the permanency of the Staff Assistant position. Accordingly, the Government's motion for summary judgment with respect to the 1990 Transfer Request and the

March 1990 Staff Assistant Reassignment is denied.

## III. The Retaliation Claims

The Government argues that the Magistrate Judge erred in denying its motion for summary judgment dismissing the Drop File and September 1990 Appraisal Retaliation Claims. Specifically, the Government contends that neither the Drop File nor the September 1990 Appraisal Retaliation Claims are actionable on the ground that neither action constitutes an "adverse action" against Vergara. The Court disagrees.

■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–3, *et seq.*, prohibits an employer from subjecting an employee to adverse employment action in retaliation for that employee's opposition to allegedly discriminatory employment practices. Specifically, Section 704(a) of Title VII provides, in pertinent part, that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1988). In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "a retaliatory motive play[ed] a part in [an] adverse employment action" taken against her. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). To accomplish this, a plaintiff must demonstrate that (1) she was engaged in activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *Id.; Sumner v. United States Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990).

■ In order to establish that the employer's conduct toward the plaintiff constitutes an adverse action, the plaintiff must prove that the conduct "affected the terms, privileges, duration, or conditions of the plaintiff's employment." *Rooney v. Witco Corp.*, 722 F.Supp. 1040, 1046 (S.D.N.Y.1989). Although in most cases the alleged conduct involves instances of retaliatory discharge, *see, e.g., Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1254 (2d Cir.1987); *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986), adverse action may take a variety of other forms. For example, this Court has recognized that providing unfair work references and placing false information in the complainant employee's personnel file may form the basis for a retaliation claim. *See Mays v. New York City Police Dep't*, 701 F.Supp. 80, 83–84 (S.D.N.Y.1988), *aff'd without op.*, 888 F.2d 1376 (2d Cir.1989). Moreover, failing to promote an employee, *Davis v. State Univ. of New York*, 802 F.2d at 641, subjecting an employee to unreasonable working conditions, *Dominic v. Consolidated Edison Co.*, 822 F.2d at 1254–55, or giving an employee unjustifiably negative performance evaluations, *Schaff v. Shalala*, No. 93 Civ. 1251, 1994 WL 395751, at *6–7, 1994 U.S.Dist. LEXIS, at *20 (D.Md. July 14, 1994), may constitute adverse action providing a basis for a plaintiff's retaliation claim.

■ In the present case, the Court finds that Vergara has raised an issue of fact as to whether the Drop File and September 1990 Retaliation Claims constitute adverse actions, thereby providing a basis for Vergara's claims. With respect to the Drop File Retaliation Claim, Vergara has presented evidence that the Guide Manager Handbook requires IRS supervisors to discuss all written evaluations with the employee before including them in the employee's drop file. Nonetheless, supervisors placed written evaluations in Vergara's drop file without first discussing them with her. In opposition, the Government argues that the Guide Manager Handbook merely sets forth recommendations and does not confer upon IRS employees any right to view their drop files. The Court finds an issue of fact exists as to whether the Guide Manager Handbook conferred upon Vergara the right to view any material placed in her drop file. The Court finds further that, if Vergara possessed such a

right, there is a factual issue as to whether the failure to bring any drop file evaluations to her attention "affected the terms, privileges, duration, or conditions of the plaintiff's employment." *See Rooney v. Witco Corp.,* 722 F.Supp. at 1046.

█ With respect to the September 1990 Appraisal Retaliation Claim, the Court cannot determine as a matter of law that the appraisal was not an adverse action against Vergara. Although there is no dispute that the evaluation did not lead to a pay reduction, the inclusion of alleged "misstatements and exaggerations," *see* Complaint at ¶ 8, may have affected the decision to deny Vergara's request to resume her managerial duties and to maintain Vergara in the Staff Assistant position. Accordingly, the Government's motion to dismiss the Drop File and September 1990 Appraisal Retaliation Claims is denied.[11]

## CONCLUSION

For the reasons set forth above, the Report is adopted in part. Specifically, the Government's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment is granted in part and denied in part. The Government's motion for summary judgment dismissing (1) Vergara's discrimination claims based on conduct occurring prior to February 20, 1990; and (2) the Annual Leave Retaliation Claim is granted. The Government's motion for summary judgment dismissing (1) Vergara's discrimination claims based on the 1990 Transfer Request the March 1990 Staff Assistant Reassignment; (2) the Drop File Retaliation Claim; and (3) the September 1990 Appraisal Retaliation Claims is denied. The parties are directed to appear at a pre-trial conference on December 14, 1994 at 2:00 P.M.

SO ORDERED.

11. Magistrate Judge Bernikow recommended that the Court dismiss the Annual Leave Retaliation Claim on the ground that, as her annual leave was subsequently restored, she suffered no adverse consequences. *See* Report at 23. Vergara does not oppose this finding. The Court agrees with the Magistrate Judge's conclusion. Accordingly, the Government's motion for summary judgment dismissing the Annual Leave Retaliation Claim is granted.