**Marshall R. MAZYCK, Plaintiff,**

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Elliot Sander, William Morange, Kevin McConville and Terrance Culhane, Defendants.**

**No. 07 Civ. 3561(DAB).**

United States District Court, S.D. New York.

Sept. 4, 2012.

Deanna R. Waldron, Rachel Dara Nicotra, Steven J. Hyman, Janet Cohn Neschis, Jonathan Robert Jeremias, McLaughlin and Stern, LLP, Norman H. Siegel, Siegel Teitelbaum & Evans LLP, New York, NY, for Plaintiff.

Craig Robert Benson, Stephen Andrew Fuchs, Elias Jay Kahn, Littler Mendelson, P.C., New York, NY, Keith Jay Rosenblatt, Littler, Mendelson, P.C., Newark, NJ, for Defendants.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Marshall R. Mazyck ("Plaintiff" or "Mazyck"), an African–American male, together with eight African–American plaintiffs and one Hispanic plaintiff, all of whom are current or former employees of the Metropolitan Transportation Authority ("MTA" or "Defendant") Police Department ("MTA PD"), commenced this action against the MTA and four MTA executive officers alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff maintains that the MTA discriminated against him on the basis of his race by denying him career advancement and earning opportunities, subjecting him to a hostile work environment, engaging in a pattern or practice of discrimination, and retaliating against him for his activities as the President of the Fraternal Guardians Organization ("Guardians") and for complaining to the State Division of Human Rights about alleged discrimination. Defendants now move pursuant to Fed.R.Civ.P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons below, Defendants' Motion for Summary Judgment is granted in part, denied in part, and the Court reserves decision in part.

## I. FACTUAL BACKGROUND

### A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of the MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 until December 2010. Defendant Kevin McConville was the Chief of the MTA PD from October 2005 to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of the MTA PD from 2004 to July 2010.

Plaintiff Marshall Mazyck began employment as a police officer with the Long Island Railroad Police Department ("LIRR PD") on December 26, 1980 and was appointed to Detective on September 11, 1991. In 1997, the New York State Legislature created the MTA, and on January 1, 1998, all employees of the LIRR PD, including Plaintiff, were transferred to the MTA PD.

### B. Plaintiff's Employment in the Applicant Investigation Unit

Following the formation of the MTA PD in 1998, Plaintiff worked almost exclusively within the Applicant Investigations Unit ("AIU"), a specialized division responsible for conducting background investigations of MTA PD applicants. (Pl. 56.1 Stmt. ¶ I.) Until approximately 2002, Plaintiff occasionally supported the Internal Affairs Bureau ("IAB") in its investigations. (*Id.*)

In early 2002, Plaintiff, along with fellow Plaintiffs Blake Willett, Kenneth

---

1. In a Scheduling Order dated September 24, 2010, the Court allowed for separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Marshall Mazyck.

Davis and Nzingha Kellman, as well as Charles Billups from the Grand Council of Guardians, arranged to meet with then MTA Executive Director and CEO Katherine Lapp ("Lapp"). (Pl. 56.1 Stmt. ¶ J.) At that meeting, Plaintiff raised several complaints regarding the treatment of minorities within the MTA PD. (*Id.*) Several weeks after the 2002 meeting with Lapp, Plaintiff, along with Kenneth Davis and Police Officer Nubia Benoit, African-American, met with MTA PD Director of Security Louis Anemone ("Anemone"), where Plaintiff again raised concerns regarding training, promotions, appointment to specialized units, and disparities in discipline of African-American and Hispanic MTA PD members. (Pl. 56.1 Stmt. ¶ L.) In or about 2002, Plaintiff, along with Darryl Jenkins, African-American, complained to Chief Savage on two occasions, stating that African-American and Hispanic MTA PD members were given fewer opportunities for training and promotions than Caucasian members, and they specifically complained about Terrance Culhane's ("Culhane") use of the word "nigger" in front of Plaintiff and other officers. (Pl. 56.1 Stmt. ¶ M)

In January 2003, Plaintiff came under the supervision of Sergeant Karen Taylor ("Taylor"). (Pl. 56.1 Stmt. ¶ N.) According to Plaintiff, upon entering the AIU, Taylor told Plaintiff and fellow Plaintiff Lillian Alvarado ("Alvarado") that she was sent there to "whip [them] into shape." (*Id.*) In her management of the AIU, Taylor instituted a policy requiring that all employees sign in and out of a district log on a daily basis. (Pl. 56.1 Stmt. ¶ CCC.) Plaintiff alleges that Taylor unfairly administered this requirement to closely monitor only the arrival times of Plaintiff and Alvarado. (*Id.*) Additionally, Plaintiff alleges that Taylor required him and Alvarado to submit memos documenting late arrivals, but did not do the same for two other employees—William Burke ("Burke"), a Caucasian male, and Benjamin Rosario ("Rosario"), an Hispanic male. (Pl. 56.1 Stmt. ¶ DDD.) Defendants claim Taylor documented the lateness and absenteeism of all members of AIU. (Def. Resp. to Pl. 56.1 Stmt. ¶ DDD.)

Taylor allegedly required Plaintiff to keep his door open at all times, yet did not require Burke and Rosario to do the same. (Pl. 56.1 Stmt. ¶ GGG.) Plaintiff alleges that Taylor chastised him for closing his door even when he was permitted to close his door, such as when taking a meal. (*Id.*) Plaintiff further alleges that Taylor assigned Plaintiff and Alvarado menial tasks that she did not assign Rosario or Burke, such as shoveling snow or having a unit vehicle washed. (Pl. 56.1 Stmt. ¶ HHH.) Defendants claim that Burke and Rosario did perform tasks such as washing cars. (Def. Resp. to Pl. 56.1 Stmt. ¶ HHH.) In December 2005, Plaintiff was assigned to uniformed patrol during the Transit Strike, while Burke and Rosario remained in the AIU and were not assigned any uniform tour change. (Pl. 56.1 Stmt. ¶ JJJ.) Plaintiff maintains that the situation caused him stress and when he called out sick the following day, the MTA ordered that his weapons be removed and he be placed on restricted duty. (*Id.*)

Plaintiff alleges that Taylor spoke to and treated him harshly on a regular basis. (Pl. 56.1 Stmt. ¶ GGG.) In a March 2006 meeting with all the investigators in the Unit, Plaintiff asked Taylor if there would be any overtime to conduct applicant investigations, to which Taylor responded, in an allegedly "aggressive, rude and unprofessional manner," that "[Y]ou, [Plaintiff], will not be getting overtime." (*Id.*)

Taylor allegedly interfered with Plaintiff's performance of his job by withholding approval of his reports and by returning them late. (Pl. 56.1 Stmt. ¶ III.) Defendants claim that Taylor was forced to reas-

sign some of Plaintiff's applications, because Plaintiff fell behind in processing them. (Def. Resp. to Pl. 56.1 Stmt. ¶ III.)

On September 26, 2006, Rosario brought a log compiled by Alvarado to Taylor's attention, which detailed the various late-arrivals of Burke and Rosario and the alleged differential treatment to which Taylor subjected Plaintiff, Alvarado, and fellow Plaintiff Marilyn Armstrong ("Armstrong"). (Pl. 56.1 Stmt. ¶ YYY.) On September 27, 2006 Taylor sent Plaintiff's personnel file to the IAB. (*Id.*) Defendants claim Plaintiff's personnel file was sent to IAB at the request of IAB Commanding Officer John D'Agostino ("D'Agostino"), pursuant to MTA's preparation of a response to Plaintiff's SDHR complaint. (Def. Resp. to Pl. 56.1 Stmt. ¶ YYY.)

On December 6, 2006, Plaintiff complained to Taylor, stating, "all your bosses right down to you are racist." (Pl. 56.1 Stmt. ¶ BBBB.) In response, Taylor allegedly told Plaintiff that those he complained of were "going to bring him down." (*Id.*) Defendants claim that in response to Plaintiff's statement, Taylor replied that Plaintiff should not make untruthful accusations, and would be proven wrong. (Def. Resp. to Pl. 56.1 Stmt. ¶ BBBB.)

On March 27, 2007, Rosario allegedly told Taylor that he overheard Plaintiff on the phone stating: "This continues to be a hostile work environment, and I should have left two years ago." (Pl. 56.1 Stmt. ¶ BBBB.) Rosario also allegedly told Taylor that Plaintiff complained that "they give all the house niggers overtime." (*Id.*) Rosario later wrote a memo regarding the incident and Taylor referred the matter to Chief D'Agostino. (*Id.*) Rosario then filed a discrimination complaint with the MTA's Office of Civil Rights ("OCR"). (Pl. 56.1 Stmt. ¶ CCCC.)

## C. AIU Investigation Overtime

Overtime of which the MTA PD is aware in advance is called anticipated overtime, and is distributed on the basis of seniority using a polling system pursuant to the Collective Bargaining Agreement ("CBA"). (Def. 56.1 Stmt. ¶ 50.) Generally, detectives within the AIU also receive unanticipated overtime in connection with their investigations. (Pl. 56.1 Stmt. ¶ R.)

In 2004, Taylor instituted a cap on the amount of overtime hours AIU detectives were permitted to work. (Pl. 56.1 Stmt. ¶ R.) Plaintiff alleges that Taylor discriminatorily supervised this ceiling, significantly decreasing the overtime earnings of the outspoken non-Caucasian members of AIU. (Pl. 56.1 Stmt. ¶ S.) Plaintiff further alleges that Taylor would become hostile toward him when he requested overtime to conduct his work. (Pl. 56.1 Stmt. ¶ U.) For example, in a March 2006 meeting to discuss candidates, Plaintiff questioned the fact that Taylor was herself exceeding the overtime cap, and Taylor allegedly responded that Plaintiff would not receive overtime. (*Id.*)

Plaintiff also alleges that Taylor unevenly administered field investigation opportunities. (Pl. 56.1 Stmt. ¶ X.) He maintains that Taylor denied him and fellow Plaintiff Alvarado the opportunity to travel to Maryland to conduct a field investigation, while permitting Burke and Rosario to travel to Maryland and incur overtime for investigations of their own candidates. (Pl. 56.1 Stmt. ¶ Z.)

After Taylor became the sole supervisor of the AIU in late 2003, Plaintiff alleges that his overtime hours decreased, while Burke's overtime hours increased in 2004 and 2005. (Pl. 56.1 Stmt. ¶ BB.) After registering 871.7 overtime hours in 2003, Plaintiff entered 439.8 hours in 2004 and 410.2 hours in 2005. (Pl. 56.1 Stmt. ¶¶ BB, CC.) Plaintiff further alleges that while he

was the most senior member of the Unit and should have been polled first for anticipated overtime, he earned less overtime than Burke and Rosario in 2006. (Pl. 56.1 Stmt. ¶ EE.) Defendants claim that Plaintiff was offered overtime opportunities but often declined them or was absent from work. (Def. Resp. to Pl. Stmt. ¶ EE.)

## D. Executive Protection Overtime

Executive Protection is a segment of the MTA PD responsible for driving MTA officials or outside dignitaries and ensuring their safety. (Pl. 56.1 Stmt. ¶ HH.) Burke and Rosario both performed Executive Protection duties while stationed in the AIU. (*Id.*) They were allegedly directly requested to perform this function, either by the source of the protection or by Detective Sergeant Wilfredo Baretto, D'Agostino, Detective Mullaney, or Director of Security William. (Pl. 56.1 Stmt. ¶¶ II, JJ.) Plaintiff claims that his requests to receive training for Executive Protection were repeatedly denied. (Pl. 56.1 Stmt. ¶ KK.)

In 2006, Plaintiff complained to the Union that Rosario and Burke were receiving Executive Protection overtime that he was not offered, in violation of the CBA. The Union agreed, stating that the responsibilities were disproportionately administered and, as anticipated overtime, should have been allocated on the basis of seniority. (Pl. 56.1 Stmt. ¶ MM.) Accordingly, Acting Chief of Police Ronald Masciana granted Plaintiff forty-one hours to be treated as overtime. (Def. Resp. to Pl. 56.1 Stmt. ¶ MM.)

## E. Plaintiff's Requests for Training

Plaintiff alleges that from 2005 to 2007 he made multiple requests to Taylor and D'Agostino to attend Executive Protection training, but all of his requests were denied. (Pl. 56.1 Stmt. ¶¶ HH, KK.) Plaintiff further alleges he was denied other training that would have substantially en-

hanced his skills. (Pl. 56.1 Stmt. ¶ OO.) For example, in or about early 2003, Plaintiff was told he could attend Cooper Institute Training, a course which teaches the standards for conducting the MTA PD's physical agilities test; however, immediately prior to the training, he was told by Masciano that he could no longer attend. (*Id.*) Plaintiff alleges that until 2004 he repeatedly requested and was denied Internal Affairs training. Plaintiff further alleges that between 2003 and 2006, he requested to attend Applicant Investigation Training. (Pl. 56.1 Stmt. ¶ PP.) Plaintiff also asserts that he made a number of requests to Masciana for Homicide training throughout his career, as well as to Chief Finneran and D'Agostino in 2004, which were denied. (Pl. 56.1 Stmt. ¶ RR.) Fellow Plaintiffs Willett and Davis attended the Homicide training. (Def. Resp. to Pl. 56.1 Stmt. ¶ RR.) The Parties dispute whether Plaintiff was denied attendance at these training courses or whether he declined some courses because of personal commitments. (Def. Resp. to Pl. 56.1 ¶ OO.)

In 2005, Burke was allegedly offered training in "Objective Pre–Employment Interviewing—Dealing Effectively with Applicant Misrepresentation" less than one year after he transferred into the AIU. (Pl. 56.1 Stmt. ¶ QQ.) Plaintiff was not offered this training until April 2007, nearly a decade after he began working in the AIU. (*Id.*) Plaintiff allegedly declined the course. (Def. Resp. to Pl. 56.1 Stmt. ¶ QQ.)

## F. Plaintiff's Requests to Transfer into the Interagency Counterterrorism Task Force

In 2003, MTA PD created a specialized elite unit known as the Interagency Counterterrorism Task Force ("ICTF"). (Pl. 56.1 Stmt. ¶ SS.) Plaintiff alleges that in or about 2002, he requested a transfer into

the JITF, the ICTF's predecessor, from Robert Terrett who oversaw the Unit. (Pl. 56.1 Stmt. ¶ TT.) In September 2003, the ICTF solicited abstracts for assignment in the Unit. (*Id.*) Mazyck did not submit an abstract in response to the September 2003 solicitation. (Def. Resp. to Pl. 56.1 Stmt. ¶ UU.) Defendants claim that three minority members submitted abstracts and were subsequently selected for assignment to the ICTF as a result of the Fall 2003 interview and selection process. (*Id.*) Plaintiff alleges that Caucasian police officers with little or no Detective-related experience were transferred into the ICTF. (Pl. 56.1 Stmt. ¶ UU.) For example, Police Officer Richard Jernick ("Jernick"), Caucasian, was allegedly promoted to Detective and assigned directly to the ICTF by July 2004, after only 7 months experience with the MTA. (Pl. 56.1 Stmt. ¶ WW.) In August 2006, MTA offered two Caucasian Police Officers, Kenneth Angelos ("Angelos") and James Trachta ("Trachta"), formerly of the Staten Island Rapid Transit Operating Authority ("SIRTOA"), promotions to Detective, and offered them transfers to the ICTF without having submitted abstracts or other requests. (Pl. 56.1 Stmt. ¶ ZZ.) Defendants claim that Angelos and Trachta were offered assignments to the ICTF because the ICTF needed members familiar with the new Staten Island District. (Def. Resp. to Pl. 56.1 Stmt. ¶ ZZ.)

Plaintiff alleges that in November 2006 he again requested transfer into the ICTF, this time during a meeting in which Taylor and D'Agostino announced the Unit would potentially be decreasing its Detective staff. (Pl. 56.1 Stmt. ¶ YY.) D'Agostino allegedly denied Plaintiff's request, stating "that is not on the table right now." (*Id.*)

Plaintiff alleges that he sought transfer into the ICTF because of Taylor's discriminatory overtime practice, and that as a result of the denial of his requests to transfer, he lost significant overtime earning potential. (Pl. 56.1 Stmt. ¶ AAA.)

## G. Plaintiff's Activities with the Guardians

In or about 1987, a group of African–American police officers including Plaintiff formed a section of the Guardians in the LIRR PD. (Pl. 56.1 Stmt. ¶ D.) The group advocated on behalf of African–American members of the LIRR PD and was allegedly created to address racial disparities. (*Id.*) The Guardians remained active after the merger and formation of the MTA PD. (*Id.*) Plaintiff was the Vice President of the Guardians until approximately 2000 and thereafter held the position of President until his retirement from the MTA in 2007. (*Id.*) In this capacity, Plaintiff would allegedly intercede on behalf of various minority officers who approached him and would attempt to mediate solutions. (Pl. 56.1 Stmt. ¶ KKK.)

On or about June 21, 2004, fellow-Plaintiff Armstrong filed a charge of discrimination against MTA with the State Division of Human Rights ("SDHR"). (Pl. 56.1 Stmt. ¶ NNN.) In June 2005, Plaintiff received a subpoena to appear on behalf of Armstrong at the SDHR, which Plaintiff brought to the attention of Chief D'Agostino. (*Id.*) Plaintiff was then contacted by MTA's Special Counsel, Rhonda Moll ("Moll"), who allegedly told Plaintiff she would accompany him to the SDHR. (*Id.*) Plaintiff allegedly stated that he did not feel comfortable with Moll accompanying him, to which Moll allegedly responded: "[I]f I'm not going, I'm not paying you." (*Id.*)

In July 2004, Police Officer Marc Thomas ("Thomas"), African–American, and his supervisor, Sergeant John Quinn ("Quinn"), Caucasian, were involved in an altercation. (Pl. 56.1 Stmt. ¶ PPP.) Plaintiff alleges that after being informed of the

incident he contacted MTA Director of Security William Morange ("Morange") in his capacity as President of the Guardians to discuss concerns regarding the pending discipline against Thomas. (Pl. 56.1 Stmt. ¶ QQQ.) Shortly thereafter, Thomas was arrested because Quinn pursued assault charges against him. (Pl. 56.1 Stmt. ¶ RRR.) Plaintiff alleges that throughout the course of the criminal trial, he encouraged members of the Guardians to show their support for Thomas. (Pl. 56.1 Stmt. ¶ SSS.) Plaintiff alleges that because of his support of Thomas, MTA restricted his access to IAB folders to which members of the AIU allegedly had access prior to this incident. (Id.) Defendants claim that Plaintiff had no legitimate reason to access these files as he had not conducted IAB investigations since 2002. (Def. Resp. to Pl. 56.1 Stmt. ¶ SSS.)

Plaintiff alleges that in November 2005, Plaintiff again met with Chief McConville, this time on behalf of fellow Plaintiff Michael Benjamin ("Benjamin"), African–American, in relation to discipline Benjamin was receiving for an incident with his supervisor, Sergeant Giel, Caucasian. (Pl. 56.1 Stmt. ¶ TTT.)

Plaintiff alleges that in early 2006, along with fellow Plaintiff Willett, he again contacted Lapp to meet with her to discuss the alleged ongoing harassment and harsh discipline being threatened against minority MTA officers. (Pl. 56.1 Stmt. ¶ UUU.) Lapp did not attend the meeting and Plaintiff met instead with Director Morange and Chief McConville and discussed Thomas' pending discipline and the alleged overall mistreatment of African–Americans within the MTA PD. (Id.)

In early 2006, Plaintiff allegedly met with Chief McConville to discuss a matter involving William Heckstall ("Heckstall"), African–American, and later testified on Heckstall's behalf in his civil discrimina-tion lawsuit against the MTA. (Pl. 56.1 Stmt. ¶ VVV.)

The Parties dispute whether Taylor was fully aware of the meetings Plaintiff attended in his capacity as President of the Guardians. (Pl. 56.1 Stmt. ¶ WWW; Def. Resp. to PL. 56.1 Stmt. WWW.) Plaintiff maintains that he specifically told Taylor he was attending meetings in his capacity as President of the Guardians, and that between 2006 and 2007, Taylor remarked to Plaintiff that he "needed to mind [his] own business and not look out for everybody else." (Id.)

### H. Plaintiff's Complaint to the State Division of Human Rights

On June 21, 2006 Plaintiff filed a charge of discrimination with the SDHR against MTA, specifically naming Taylor and D'Agostino. (Pl. 56.1 Stmt. ¶ XXX.) Plaintiff alleged that he had been subjected to disparate treatment, had been denied training and assignment to special units, and subjected to excessive scrutiny. (Id.)

On or about October 20, 2006, Taylor received a copy of Plaintiff's SDHR complaint. (Pl. 56.1 Stmt. ¶ ZZZ.) On October 27, 2006, Taylor gave Plaintiff a Letter of Instruction for tardiness. (Pl. 56.1 Stmt. ¶ AAAA.) Plaintiff alleges that Taylor did not issue similar letters to Burke when he was late and falsely recorded his sign-in time. (Id.)

### I. Plaintiff's Retirement from the MTA PD

Plaintiff retired from the MTA PD in June 2007. (Pl. 56.1 Stmt. ¶ FFFF.) Plaintiff alleges the ongoing harassment by Taylor, the threat of discipline and a tarnished record, the differential treatment of detectives Rosario and Burke, the danger of a diminishing pension as a result of denied overtime, as well as the ongoing

complaints without resolution, caused him to retire early.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005). Genuine issues of material fact cannot be created by merely conclusory allegations. *Victor v. Milicevic*, 361 Fed.Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. *Melendez v. Mitchell*, 394 Fed. Appx. 739, 740 (2d Cir.2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The non-movant may not rely upon speculation and/or conjecture to overcome a motion for summary judgment. *Burgess v. Fairport Cent. Sch. Dist.*, 371 Fed.Appx. 140, 141 (2d Cir.2010). Instead, when the moving party has documented particular facts in the record, "the opposing part must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.*

### B. Disparate Treatment Based on Race and Gender Under Title VII, NYSHRL, NYCHRL

#### 1. Legal Standard

In the Amended Complaint, Mazyck alleges that Defendant MTA, in violation of Title VII, NYSHRL, NYCHRL, discriminated against him on the basis of his race and subjected him to a hostile work environment and retaliation. Courts in this Circuit analyze Title VII claims of employment discrimination according to the three-stage, burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Claims under the NYSHRL and the NYCHRL are subject to the same burden-shifting analysis applied to discrimination claims under Title VII.[2]

---

**2.** Under the Local Civil Rights Restoration Act of 2005, Local Law No. 85 of the City of New York, "analysis [of NYCHRL provisions] must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir.2010) (quoting *Williams v. N.Y. City Housing Auth.*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27 (N.Y.App. Div.2009), leave to appeal denied by 13 N.Y.3d 702, 2009 WL 2622097 (2009)). Despite this, "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Julius v. Dep't of Human Res. Admin.*, 2010 WL 1253163, at *5 (S.D.N.Y. March 24, 2010) (internal citations removed). Under the NYCHRL, a plaintiff "must still establish 'by a preponderance of the evidence that [he] has been treated less well than other employees' because of [his protected status]." *Id.*

Under *McDonnell Douglas,* a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187 (2d Cir.2001). In order to make out a *prima facie* case, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008). A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group. *Int'l Broth. of Teamsters v. U.S.,* 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

A plaintiff who makes out a *prima facie* case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant. *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005). To meet its burden, the defendant must articulate a "legitimate, nondiscriminatory reason" for the challenged conduct. *Texas Dept. of C'mty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant produces such a reason, "the presumption of discrimination drops out" and the burden of proof shifts back to the plaintiff. *Woodman,* 411 F.3d at 76 (citation omitted). To prevail on his claim, the plaintiff must then show, without the benefit of the presumption, that the employer's action was in fact the result of discrimination. *Holcomb,* 521 F.3d at 138. The plaintiff need not prove that the explanation offered by the employer was entirely false, "but only that . . . [defendant's] stated reason was not the only reason" and that consideration of an impermissible factor "did make a difference." *Montana v. First Federal Savings & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir.1989).

### 2. Timeliness of Claims

■ Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency. 42 U.S.C. § 2000e–5(e)(1). Plaintiff Mazyck filed an administrative complaint with the New York State Division of Human Rights on June 21, 2006. (Pl. 56.1 Stmt. ¶ XXX.) Accordingly, only those incidents allegedly occurring on or after August 25, 2005 are actionably under Title VII. *Patterson v. County of Oneida, N.Y., et al.,* 375 F.3d 206, 220 (2d Cir.2004) (Title VII precludes recovery for discrete acts that occur outside the statutory time period even if other acts of discrimination occurred within the time period). Discrimination claims under the NYSHRL and the NYCHRL are subject to a three-year statute of limitations. *Lange v. Town of Monroe,* 213 F.Supp.2d 411 (S.D.N.Y.2002) (applying NYSHRL). Nonetheless, earlier incidents may be cited for context. *Flynn v. New York State Div. of Parole,* 620 F.Supp.2d 463 (S.D.N.Y. 2009). As this action was brought on May 4, 2007, only those incidents occurring on or after May 4, 2004 are actionable under the NYSHRL and the NYCHRL.

### 3. Discussion

Plaintiff Mazyck alleges that Defendants discriminated against him on the basis of his race by (1) failing to transfer him to the ICTF; (2) denying him training opportunities; and (3) denying him overtime. First, Plaintiff claims it was adverse and discriminatory when Defendants denied his requests to be transferred into the ICTF in 2004 and 2006. There is no dispute that Plaintiff has met the first two

prongs of his *prima facie* case. However, Defendants argue that Plaintiff (1) never properly applied to join the ICTF; and (2) the alleged actions did not occur under circumstances giving rise to an inference of discrimination.

■ Failure to grant a lateral transfer may constitute adverse action if the plaintiff can provide "objective indicia of material disadvantage." *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir.2008) To establish a *prima facie* case regarding the alleged failure to transfer, Plaintiff must show that "[he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207). However, "*Burdine* is subject to modification where the facts of a particular case make an allegation of a specific application a quixotic requirement," such as the existence of an acknowledged informal procedure that the employee used. *Id.* Plaintiff alleges that there was an alternative application process for the ICTF: Members of the MTA PD made informal requests to transfer and some such requests were granted. Plaintiff contends that he followed the informal process in making similar requests for transfer. Accordingly, Plaintiff's failure to submit a formal application for transfer is not, as a matter of law, fatal to his claim. *Id.*

■ Plaintiff still bears the initial burden of demonstrating that MTA's actions occurred under circumstances giving rise to an inference of discrimination. Plaintiff alleges that several junior Caucasian officers received a position in ICTF without submitting abstracts. However, other African–American detectives successfully transferred into ICTF, including two fellow Plaintiffs. Moreover, fellow Plaintiff Davis was transferred to the ICTF without submitting a formal abstract. Circumstances where other African–Americans were transferred into his desired unit, including one who did not formally apply, do not raise an inference that Mazyck's failure to transfer was discriminatory. Accordingly, to the extent Plaintiff's claims of discrimination are based on his failed transfer to the ICTF, Defendants' Motion for Summary Judgment is GRANTED.

■ Second, Plaintiff claims he was denied training throughout his tenure as a Detective and specifically denied Executive Protection training, which resulted in a significant loss of overtime. Even assuming the denial of training constitutes an adverse employment action, *Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F.Supp.2d 599, 610–11 (S.D.N.Y.2012), the circumstances here do not raise an inference of discrimination. Mazyck alleges that Taylor and D'Agostino denied him Executive Protection training while two other members of the AIU, Rosario and Burke, received this training and were able to conduct overtime by performing Executive Protection duties. However, neither Burke nor Rosario received this training while assigned to the AIU, but received it in the late 1990's prior to being assigned to the unit. Moreover, the fact that Rosario, a Hispanic, received executive protection training suggests that race did not influence Defendants' determination.

Plaintiff also alleges that the denial of other requests for training was discriminatory. These allegations are conclusory; Mazyck does not allege any facts to suggest any particular denial was on account of his race. The mere fact that Plaintiff did not receive the training that he wanted, when he wanted it, does not raise an inference of discrimination. Therefore, to

the extent that Plaintiff's discrimination claims are based on the denial of training opportunities, Defendants' Motion for Summary Judgment is GRANTED.

■ Third, Mazyck's allegation that he was denied opportunities for overtime satisfies the third prong of his *prima facie* case, as denial of overtime can constitute an adverse employment action. See, e.g., *Little v. National Broadcasting Co., Inc.*, 210 F.Supp.2d 330, 379 (S.D.N.Y.2002) (plaintiff could be subject to adverse employment action where he lost income because of lost overtime); *Faggiano v. Eastman Kodak Co.*, 378 F.Supp.2d 292, 306 (W.D.N.Y.2005) (lost opportunities for earning overtime constituted adverse employment action).

As to the inference of discrimination, Plaintiff alleges that (1) Taylor capped the amount of overtime that members of the AIU could earn but did not regulate the cap equally; (2) both Burke and Rosario were permitted to travel to Maryland on a particular occasion to conduct a field investigation, while he was denied the same opportunity; and (3) Burke and Rosario received Executive Protection overtime assignments that were not offered to Plaintiff.

■ Assuming these circumstances raise an inference of discrimination sufficient to shift the burden, Defendants have furnished legitimate, nondiscriminatory reasons for the challenged conduct. In the first instance, Defendants allege that Burke and Rosario received more assignments resulting in accumulated overtime because they were more up-to-date with their caseloads. Defendants also allege that Mazyck sometimes turned down overtime. With regard to Executive Protection duties, Defendants submit that Burke and Rosario received these assignments because both had previously completed such training, had prior experience in this role, and were specifically requested by

MTA executives. Defendants also note that Mazyck received more overtime pay than Burke in 2005, even though Mazyck's overtime earnings had decreased from the previous year.

Because Defendants have proffered a legitimate explanation for the challenged acts, any presumption of discrimination "drops from the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Mazyck must therefore "prove the ultimate issues without any benefit of ... intermediate burdens and presumptions." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir.2009). Plaintiff here has failed to do so. He has not submitted concrete evidence to show that it is more likely than not that Defendants' purported explanation for Mazyck's overtime earnings is merely pretextual. Accordingly, to the extent Plaintiff's claims of discrimination are based on his alleged denial of overtime, Defendants' Motion for Summary Judgment is GRANTED.

### C. Hostile Work Environment Claims

■ "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive ... although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe," *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712,

724 (2d Cir.2010) (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987)).

■ "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999). Whether a reasonable person would find a given work environment hostile depends on the "totality of the circumstances," consideration of which includes: (1) frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Although for the most part Title VII, NYSHRL, and NYCHRL hostile work environment and retaliation claims are reviewed under the same standards, a number of courts, although not the New York Court of Appeals, have found "that interpretations of State or federal [discrimination statutes] worded similarly to NYCHRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise' given the 'uniquely broad and remedial provisions of the local law.'" *Williams v. New York City Housing Authority,* 61 A.D.3d 62, 872 N.Y.S.2d 27, 31 (1st Dep't.2009); see also *Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 723 (2d Cir.2010) (same); *Winston v. Verizon Services Corp.,* 633 F.Supp.2d 42, 47–48 (S.D.N.Y. 2009) (same).

Defendant MTA contends that Plaintiff's hostile work environment claims are based on the following conduct: (1) denial of access to IAB personnel files and cabinets in Plaintiff's office; (2) starting in 2005, Plaintiff was allegedly subjected to excessive scrutiny by his supervisor, Taylor, because she kept track of all of his late arrivals, while she allegedly did not do the same for a white officer; and (3) in his capacity as President of the Guardians, Plaintiff was aware of racially derogatory comments made by supervisors to African-American officers, such as fellow Plaintiff Benjamin allegedly being called a "nigger." Defendant argues that this conduct, alone, is insufficient to support a claim of hostile work environment. However, Defendants have failed to establish that the only bases for Plaintiff Mazyck's hostile work environment claim are the aforementioned incidents.

■ Defendants' instant Motion moves for Summary Judgment on only Plaintiff Mazyck's claims, but a number of fellow Plaintiffs also make allegations about a hostile work environment. With hostile work environment claims, "the crucial inquiry focuses on the nature of the workplace environment as whole, [so] a plaintiff who [himself] experiences discriminatory harassment need not be the target of other instances of hostility in order for those instances to support [his] claim." *Cruz,* 202 F.3d at 570. It is not necessary that "offensive remarks are behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim. *Id.* Even if Mazyck himself "were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall hostile or abusive environment, which exacerbated the effect of the harassment [Mazyck] experienced individually." *Id.* at 571 (internal quotations omitted). Defendants have therefore failed to establish that there is no dispute

as to any material facts even assuming they are correct in asserting that the denial of access to IAB personnel files, excessive scrutiny and incidents of which he learned as President of the Guardians alone would be insufficient to make out a hostile work environment claim.

Accordingly, the Court reserves decision on Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claims until Defendants' Motion for Summary Judgment on all Plaintiffs claiming hostile work environment are fully submitted for the Court's review.

### D. Retaliation Claims

Mazyck alleges that he was retaliated against, in violation of Title VII, NYSHRL, NYCHRL, and 42 U.S.C. § 1981, after he filed a formal complaint of discrimination with the New York State Division of Human Rights ("SDHR") on June 21, 2006, and for his activities with the Guardians. Plaintiff alleges that the MTA retaliated against him for filing a discrimination complaint by (1) issuing a Letter of Instruction ("LOI"), (2) denying him assignment to the ICTF, and (3) pursuing an internal investigation against him. Additionally, Plaintiff alleges that Defendants retaliated against for his activities with the Guardians by (1) denying him overtime, and (2) denying him access to IAB files.

 To establish a *prima facie* case of retaliation under Title VII, § 1981 and NYSHRL, a plaintiff must establish by a preponderance of the evidence: (1) participation in a protected activity; (2) the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action.[3] *Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010). Under NYCHRL, a plaintiff need not show that she suffered a materially adverse action, but must instead show that the employer's conduct was "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8–107(7); *Williams,* 61 A.D.3d at 71, 872 N.Y.S.2d 27.

As to Plaintiff's SDHR complaint, the Parties do not dispute that Plaintiff engaged in activities protected by Title VII, nor that Defendants had knowledge of Plaintiff's complaint. Defendants contend, however, that Plaintiff has failed to submit sufficient evidence to satisfy the third and fourth prongs of the *prima facie* case.

 To establish adverse employment action, Plaintiff must demonstrate that the conduct "affected the terms, privileges, duration or conditions of [his] employment." *Castro v. Local 1199,* 964 F.Supp. 719, 729 (S.D.N.Y.1997) (*quoting Vergara v. Bentsen,* 868 F.Supp. 581, 591 (S.D.N.Y.1994)). Here, the LOI satisfies this prong. *Pazamickas v. N.Y. State Office of Mental Retardation & Dev. Disabilities,* 963 F.Supp. 190, 196–97 (N.D.N.Y.1997). While "petty slights, minor annoyances, and simple lack of manners will not give rise to actionable retaliation claims ... [a] formal reprimand issued is not a 'petty slight' ... it can reduce an employee's likelihood of receiving future bonuses, raises and promotions, and may lead the employee to believe (correctly or not) that [his] job is in jeopardy." *Millea v. Metro–North R. Co.,* 658 F.3d 154, 165 (2d Cir. 2011). The issuance of the LOI could

---

**3.** New York Courts apply the same analysis for retaliation claims under state law as in federal employment cases and are subjected to the same standard of proof under Title VII. *Hendler v. Intelecom USA, Inc.,* 963 F.Supp.

200, 209–11 (E.D.N.Y.1997); *see also Pazamickas v. N.Y. State Office of Mental Retardation & Dev. Disabilities,* 963 F.Supp. 190, 196–97 (N.D.N.Y.1997).

therefore constitute adverse employment action.

▮ Plaintiff must still establish a causal connection between his SHDR complaint and the issuance of the LOI. Causation can be established "by showing that the protected activity was closely followed in time by the adverse action." *Mullins v. City of New York,* 626 F.3d 47, 53 (2d Cir.2010). The proximity between Taylor's receipt of a copy of Plaintiff's SDHR complaint on October 20, 2006 and the LOI issuance on October 27, 2006 is plainly sufficient to satisfy this prong. *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010). Such a close temporal connection between the protected activity and the adverse action is adequate to establish causation.

▮ With Mazyck having established a *prima facie* retaliation case, Defendants argue there was a legitimate, non-retaliatory reason for the LOI: Mazyck was often late. *See Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005) (*McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII). Because Defendants have proffered a legitimate explanation for the challenged acts, any presumption of discrimination "drops from the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). However, Plaintiff alleges that Burke, a Caucasian member of the AIU, was often late and never received an LOI. This allegation raises a genuine issue of material fact as to whether the reason offered by Defendants was pretextual. *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 504 (2d Cir.2009). Accordingly, to the extent Plaintiff's claims of retaliation are based on the issuance of an LOI, Defendants' Motion for Summary Judgment is DENIED.

Plaintiff also alleges that MTA retaliated against him by denying his November 2006 request to transfer to the ICTF. Failure to grant a lateral transfer may constitute an adverse employment action if the plaintiff can provide "objective indicia of material disadvantage." *Beyer v. County of Nassau,* 524 F.3d 160, 164 (2d Cir.2008).

▮ Even assuming the failure to transfer Plaintiff to the ICTF upon his request in 2006 constituted an adverse employment action, he has not established a causal connection between his SDHR complaint and the alleged failure to transfer. While the denial of Mazyck's request to transfer to the ICTF occurred less than one month after Taylor learned of his SDHR complaint, there was only one Detective assigned to ICTF in 2006, James Trachta, whose transfer was pursuant to a merger agreement. Circumstances where the only assignment into Plaintiff's desired unit was made pursuant to a merger agreement do not raise an inference that retaliation was more likely than not the reason that MTA PD denied Mazyck's request to transfer into the ICTF. *Gordon v. New York City Board of Ed.,* 232 F.3d 111, 117 (2d Cir.2000). Accordingly, to the extent that Plaintiff's retaliation claim is based on the denial of his 2006 request to transfer to the ICTF, Defendants' Motion for Summary Judgment is GRANTED.

▮ Mazyck further alleges that Defendant MTA retaliated against him by pursuing an internal investigation against him following his SDHR complaint. Even assuming that pursuit of an internal investigation constituted an adverse employment action, the record does not indicate any causal connection between Mazyck's SDHR complaint and the conduct at issue. The temporal gap of more than five months between when Taylor learned of Mazyck's discrimination complaint and Taylor's alleged initiation of an internal investigation against Mazyck is unable to support an inference of causation that

could defeat summary judgment. *Garrett v. Garden City Hotel, Inc.,* No. 05 Civ. 0962(JFB), 2007 WL 1174891 at *7–8, 2007 U.S. Dist. LEXIS 31106 at *21 (E.D.N.Y. Apr. 19, 2007) (gap of more than two months is too long to support inference of causal link) (collecting cases); *Cunningham v. Consol. Edison, Inc.,* No. 03 Civ. 3522(CPS), 2006 WL 842914 at *19, 2006 U.S. Dist. LEXIS 22482 at *55 (E.D.N.Y Mar. 28, 2006) ("a passage of two months between the protected activity and the adverse employment action seems to be the dividing line") (collecting cases). To the extent that Mazyck's retaliation claims are based on the internal investigation, Defendants' Motion for Summary Judgment is GRANTED.

■ In addition to his SDHR complaint, Mazyck alleges that Defendant MTA retaliated against him because of his activities with the Guardians. Specifically, Plaintiff alleges he was retaliated against following his support of Police Officer Marc Thomas ("Thomas") during Thomas' criminal trial, and following his subpoenaed testimony for co-Plaintiff Armstrong's SDHR complaint. As to Plaintiff's support of Thomas, the anti-retaliation clause of Title VII protects an individual who has "participated in any manner" in a Title VII related proceeding. *Jute,* 420 F.3d at 173. As Thomas was involved in a criminal trial and not a Title VII related proceeding, Mazyck's support of Thomas throughout his criminal trial does not amount to a protected activity. Accordingly, to the extent that Mazyck's retaliation claims are based on his support of Thomas, Defendants' Motion for Summary Judgment is GRANTED.

As to Plaintiff's allegation that Defendants retaliated against him for his testimony on behalf of Armstrong in an SDHR legal proceeding, such testimony constitutes activity protected by Title VII. *Jute,*

420 F.3d at 173. There is no dispute that Defendants had knowledge of Plaintiff's subpoenaed testimony. Defendants contend, however, that Plaintiff has failed to submit sufficient evidence to satisfy the third and fourth prongs of his *prima facie* case: that he suffered an adverse employment action and there was a causal connection between that action and his protected activity.

To establish an adverse employment action, Plaintiff must demonstrate that the conduct "affected the terms, privileges, duration or conditions of [his] employment." *Vergara v. Bentsen,* 868 F.Supp. 581, 591 (S.D.N.Y.1994) (quoting *Rooney v. Witco Corp.,* 722 F.Supp. 1040, 1046 (S.D.N.Y. 1989)). This characterization is broad and may consist of activity "less severe than outright discharge." *Dortz v. City of New York,* 904 F.Supp. 127, 156 (S.D.N.Y.1995).

■ Here, Plaintiff alleges that after he stated to MTA Special Counsel Rhonda Moll that he would prefer it if she did not accompany him, she told him "[I]f I'm not going, I'm not paying you." Mazyck alleges this resulted in him having to travel to the State Division to testify on his own time. However, he does not allege facts sufficient to demonstrate this constituted adverse employment action. Mazyck has not demonstrated that the denial of compensation barred him from giving testimony in the SDHR proceeding. Plaintiff was still interviewed for the proceeding in August 2005. The denial of compensation for the time of his testimony was not so disruptive that it can be said to have crossed the line from "mere inconvenience" to "materially adverse" employment action. *Cf. Boyd v. Presbyterian Hosp. in City of New York,* 160 F.Supp.2d 522, 537 (S.D.N.Y.2001). Plaintiff has not demonstrated that he was unequivocally entitled to compensation for participation in the proceeding. *Id.* at 538. Moreover, it was

Plaintiff's refusal to have MTA counsel accompany him that resulted in him traveling to the proceeding alone and without compensation. Plaintiff cannot refuse accompaniment with the knowledge that he would not be paid as a result, and later claim that failing to pay him was adverse. Accordingly, to the extent that Mazyck's retaliation claim is based on the denial of compensation for his testimony on behalf of Armstrong, Defendant's Motion for Summary Judgment is GRANTED.

**E. Pattern or Practice of Discrimination Claims**

 Plaintiff Mazyck maintains that Defendants' conduct towards racial minorities in the MTA PD amounted to a pattern or practices of discrimination. Although Title VII initially envisioned that the government would pursue pattern or practices claims, 42 U.S.C. § 2000e–6, courts have unequivocally granted private individuals the right to vindicate those claims. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). However, "no such pattern-or-practice theory of liability is available to the private non-class plaintiffs in this case." *Chin v. Port Auth. of N.Y. & N.J. Inc.,* 685 F.3d 135, 145–46 (2d Cir.2012). *See also Houston v. Manheim–New York,* No. 09 Civ. 4544, 2010 WL 6121688, at *5–6 (S.D.N.Y. July 7, 2010) ("Pattern or practice discrimination claims ... must be made as a class action."), *report and recommendation adopted,* 2011 WL 924199 (S.D.N.Y. March 16, 2011); *United States v. City of New York,* 631 F.Supp.2d 419, 427 (S.D.N.Y. 2009) ("[T]his Court holds that individuals cannot maintain a private, non-class, pattern-or-practice claim").

Here, Mazyck and his fellow Plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defen-dants' Motion for Summary Judgment on these claims is hereby GRANTED.

**F. Claims Against MTA and Individual Defendants in Their Official Capacities Under 42 U.S.C. §§ 1981 and 1983**

Mazyck alleges that Defendant MTA is liable under 42 U.S.C. § 1981 and 1983 for engaging in discriminatory conduct by subjecting him to disparate treatment, a hostile work environment, retaliation and a pattern and practice of discrimination. Plaintiff also asserts claims under §§ 1981 and 1983 against individual Defendants Elliot Sander, William Morange, Kevin McConville, and Terrance Culhane in their official capacities. These claims against individual defendants in their official capacity are deemed to be brought against the MTA itself. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

 As a threshold matter, Defendants Sander and Morange are sued purely in their official capacities (Am. Compl. ¶¶ 16–17), and thus they cannot also be held individually liable under § 1983. *Hafer,* 502 U.S. at 27, 112 S.Ct. 358. Similarly, to the extent that Defendants Kevin McConville and Terrance Culhane are sued in their official capacities, they also cannot be held liable under § 1983.

 Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida, New York,* 375 F.3d 206, 224 (2d Cir.2004) (citing *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68–69 (2d Cir. 2000)). Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects or causes to be subjected, any citizen of the

United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. Section 1983 "is not itself" a source of substantive rights' but merely provides a "method for vindicating federal rights elsewhere conferred," such as those conferred by § 1981. *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Indeed, "the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." *Patterson*, 375 F.3d at 225 (emphasis in original) (citing *Jett v. Dallas Indep. School District*, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

 A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII. *Patterson*, 375 F.3d at 225. "A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action, such as a claim for denial of equal protection, so long as the § 1983 claim is based on a distinct violation of a constitutional right." *Patterson*, 375 F.3d at 225 (internal quotations omitted). Here, Plaintiff's § 1983 claims for disparate treatment, hostile work environment, retaliation, and a pattern and practice of discrimination duplicate his racial claims under Title VII. Nonetheless, in the Amended Complaint, Plaintiff Mazyck alleges that Defendant MTA's actions deprived him of "rights, privileges and immunities secured by the United States Constitution and law and [§ 1983]." (Am. Compl. ¶ 216.)

 Even assuming Mazyck's § 1983 claim alleges a violation of legal rights separate and distinct from his Title VII claim, a municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality ... the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226. The policy or custom need not be an express rule or regulation; rather, it is sufficient for a plaintiff to show that the discriminatory conduct is so "persistent and widespread ... so permanent and well settled as to constitute a custom or usage with the force of law." *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 870–71 (2d Cir.1992). Additionally, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir.2001).

 Although Plaintiff alleges that the MTA had a custom or policy of discrimination because it allegedly acquiesced in or condoned unlawful discrimination, the record does not support these allegations. Mazyck claims that Morange and McConville failed to take appropriate action following a meeting in 2006. Mazyck also alleges that Morange did not act upon quarterly reports reflecting the "underutilization" of minorities within the MTA PD and that McConville took no remedial action despite being aware of the Plaintiff's complaints of discrimination and retaliation. Finally, Plaintiff alleges that not all MTA supervisors were well trained in the MTA's EEO policy. These claims do not sufficiently allege a policy or practice of discrimination. Plaintiff's allegation about one meeting in 2006 and his frustration with any alleged lack of response is insufficient so show the MTA had a policy or practice of discrimination. In addition, Plaintiff has presented no evidence showing that any "underutilization" of minority

employees was discriminatory, let alone pursuant to a general policy or custom of discrimination. Such alleged conduct does not amount to a practice that is "so persistent and widespread as to constitute a custom or usage with the force of law." *Sorlucco,* 971 F.2d at 870–71.

Plaintiff's general allegations that defendants "engaged in discriminatory conduct by subjecting, at the very least here, ten Plaintiffs to disparate treatment, hostile work environment, retaliation and a pattern and practice of discrimination" are insufficient, as a matter of law, to defeat summary judgment. Plaintiff has not, as required, "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.,* 607 F.3d at 292. Because Plaintiff Mazyck cannot demonstrate that the MTA had a custom or policy of discrimination, he is unable to state a claim against the MTA or the individual defendants in their official capacities under §§ 1981 or 1983. Accordingly, Defendant's Motion for Summary Judgment on these claims is GRANTED.

### G. Claims Against Individual Defendants in Individual Capacities

■ Plaintiff Mazyck also asserts claims under §§ 1981 and 1983 against Defendants McConville and Culhane in their individual capacities. In order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Patterson,* 375 F.3d at 229 (citing *Whidbee,* 223 F.3d at 75). Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983. *Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107, 122

(2d Cir.2004). Personal involvement includes direct participation as well as "gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson,* 375 F.3d at 229.

■ As to Defendant Culhane, Plaintiff alleges that he held the position of Chief of the Region in which eight of the ten Plaintiffs worked, that he had a history of racial bias, and that he knew or should have known about the complaints of discrimination made directly to him, or about him to other Chiefs. However, Plaintiff does not allege specific facts to indicate Culhane knew of any discriminatory conduct, nor does he allege Culhane personally engaged in discriminatory conduct directed at Mazyck. Plaintiff alleges only that Culhane made discriminatory remarks in his presence sometime in the late 1980's or early 1990's, acts which did not occur within the limitations period. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to §§ 1981 and 1983 claims against Defendant Culhane in his individual capacity.

■ With regard to Defendant McConville, the MTA PD's Chief of Police with policy-making authority, Plaintiff alleges that he took no remedial action despite being aware of Mazyck's discrimination and retaliation complaints. While Plaintiff does not allege that McConville personally engaged in discriminatory conduct, he does allege that he met with McConville on several occasions regarding what he perceived to be unfair treatment minority officers by their supervisors. Specifically, Plaintiff alleges that he met with McConville in November 2005 on behalf of fellow Plaintiff Benjamin who was facing disciplinary charges, and in 2006 about an investigation involving Thomas. However,

as discussed *supra,* Mazyck has not demonstrated any genuine dispute of material fact as to whether the MTA discriminated against him on account of his race. He has also failed to demonstrate that McConville was aware that "constitutional violations [were] occurring." *Patterson,* 375 F.3d at 229. Moreover, with regard to McConville's knowledge of Benjamin's disciplinary charges, the record demonstrates that McConville did respond and referred the matter to IAB. (*See, e.g.* McConville Dep. 68:7–25, 103:8–16, 106:15–107:2; Neal Dep. 56:6–19; Jeremias Decl. in Opp. to Motion for Summ. Jmt. Against Pl. Michael Benjamin, Ex. B at D00003172.)[4] Mazyck's other general allegations that McConville failed to respond following a meeting about someone who is not a Plaintiff in this case are simply insufficient to raise a genuine issue of material fact about whether McConville was grossly negligent in response to knowledge of constitutional violations.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to §§ 1981 and 1983 claims against Defendant McConville in his individual capacity.

### 3. NYSHRL and NYCHRL

 Plaintiff asserts that Defendants McConville and Culhane should be held individually liable as aiders and abettors pursuant to NYSHRL and NYCHRL. Under NYSHRL and NYCHRL, "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code City N.Y. § 8–107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under

§ 296(6). *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), abgt'd on other gnds by *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Patane v. Clark,* 435 F.Supp.2d 306, 313 (S.D.N.Y.2006). However, accessory liability may only be found where a primary violation has been established. *Patane,* 435 F.Supp.2d at 314.

As discussed, supra, Mazyck has not demonstrated the existence of any genuine issues of material fact as to whether Defendant MTA discriminated against him on account of his race. Because Plaintiff is not able to establish a primary violation, individual Defendants McConville and Culhane cannot be liable for aiding and abetting. *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F.Supp.2d 345, 363 (S.D.N.Y.2007). Defendants' Motion for Summary Judgment on this claim must therefore be GRANTED.

### III. CONCLUSION

For all the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part, DENIED in part, and decision is reserved in part. Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's claims of retaliation based on the LOI. The Court reserves decision with respect to Plaintiff's hostile work environment claims. Defendants' Motion for Summary Judgment on all of Plaintiff Mazyck's other claims is GRANTED.

**SO ORDERED.**

4. "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3).